# SCHOOL BOARD OF NASSAU COUNTY, FLORIDA, ET AL. *v.* ARLINE

No. 85–1277.   Argued December 3, 1986—Decided March 3, 1987

Brennan, J., delivered the opinion of the Court, in which White, Marshall, Blackmun, Powell, Stevens, and O'Connor, JJ., joined. Rehnquist, C. J., filed a dissenting opinion, in which Scalia, J., joined, *post*, p. 289.

*Brian T. Hayes* argued the cause for petitioners. With him on the briefs was *John D. Carlson.*

*Solicitor General Fried* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Reynolds, Deputy*

*Solicitor General Ayer, Deputy Assistant Attorney General Carvin, Richard J. Lazarus,* and *Mark L. Gross.*

*George K. Rahdert* argued the cause for respondent. With him on the brief was *Steven H. Malone.** 

JUSTICE BRENNAN delivered the opinion of the Court.

Section 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U. S. C. § 794 (Act), prohibits a federally funded state program from discriminating against a handicapped individual solely by reason of his or her handicap. This case presents the questions whether a person afflicted with tuberculosis, a contagious disease, may be considered a "handicapped individual" within the meaning of § 504 of the Act, and, if so, whether such an individual is "otherwise qualified" to teach elementary school.

---

*Briefs of *amici curiae* urging reversal were filed for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby;* and for Congressman William E. Dannemeyer et al. by *William E. Dannemeyer, pro se.*

Briefs of *amici curiae* urging affirmance were filed for the Association for Retarded Citizens of the United States et al. by *Thomas K. Gilhool, Michael Churchill, Frank J. Laski, Timothy M. Cook, Stanley S. Herr,* and *Donald S. Goldman;* and for the Employment Law Center et al. by *Robert E. Borton.*

Briefs of *amici curiae* were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, and *Marian M. Johnston* and *M. Anne Jennings,* Deputy Attorneys General, and by the Attorneys General for their respective States as follows: *Stephen H. Sachs* of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *W. Cary Edwards* of New Jersey, *Robert Abrams* of New York, and *Bronson C. La Follette* of Wisconsin; for the American Medical Association by *Benjamin W. Heineman, Jr.,* and *Carter G. Phillips;* for the American Public Health Association et al. by *Nan D. Hunter* and *Herbert Semmel;* for Doctors for AIDS Research and Education by *Stanley Fleishman, Joseph Lawrence, Susan D. McGreivy,* and *Paul Hoffman;* for the Epilepsy Foundation of America by *Alexandra K. Finucane;* for the National School Boards Association by *Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon;* and for Senator Cranston et al. by *Arlene Mayerson.*

## I

From 1966 until 1979, respondent Gene Arline taught elementary school in Nassau County, Florida. She was discharged in 1979 after suffering a third relapse of tuberculosis within two years. After she was denied relief in state administrative proceedings, she brought suit in federal court, alleging that the school board's decision to dismiss her because of her tuberculosis violated § 504 of the Act.[1]

A trial was held in the District Court, at which the principal medical evidence was provided by Marianne McEuen, M.D., an assistant director of the Community Tuberculosis Control Service of the Florida Department of Health and Rehabilitative Services. According to the medical records reviewed by Dr. McEuen, Arline was hospitalized for tuberculosis in 1957. App. 11–12. For the next 20 years, Arline's disease was in remission. Id., at 32. Then, in 1977, a culture revealed that tuberculosis was again active in her system; cultures taken in March 1978 and in November 1978 were also positive. Id., at 12.

The superintendent of schools for Nassau County, Craig Marsh, then testified as to the school board's response to Arline's medical reports. After both her second relapse, in the spring of 1978, and her third relapse in November 1978, the school board suspended Arline with pay for the remainder of the school year. Id., at 49–51. At the end of the 1978–1979 school year, the school board held a hearing, after which it discharged Arline, "not because she had done anything wrong," but because of the "continued reoccurence [sic] of tuberculosis." Id., at 49–52.

In her trial memorandum, Arline argued that it was "not disputed that the [school board dismissed her] solely on the basis of her illness. Since the illness in this case qualifies the

---

[1] Respondent also sought relief under 42 U. S. C. § 1983, alleging that the board denied her due process of law. Both the District Court and the Court of Appeals rejected this argument, and respondent did not present the issue to this Court.

Plaintiff as a 'handicapped person' it is clear that she was dismissed solely as a result of her handicap in violation of Section 504." Record 119. The District Court held, however, that although there was "[n]o question that she suffers a handicap," Arline was nevertheless not "a handicapped person under the terms of that statute." App. to Pet. for Cert. C–2. The court found it "difficult . . . to conceive that Congress intended contagious diseases to be included within the definition of a handicapped person." The court then went on to state that, "even assuming" that a person with a contagious disease could be deemed a handicapped person, Arline was not "qualified" to teach elementary school. *Id.*, at C–2—C–3.

The Court of Appeals reversed, holding that "persons with contagious diseases are within the coverage of section 504," and that Arline's condition "falls . . . neatly within the statutory and regulatory framework" of the Act. 772 F. 2d 759, 764 (CA11 1985). The court remanded the case "for further findings as to whether the risks of infection precluded Mrs. Arline from being 'otherwise qualified' for her job and, if so, whether it was possible to make some reasonable accommodation for her in that teaching position" or in some other position. *Id.*, at 765 (footnote omitted). We granted certiorari, 475 U. S. 1118 (1986), and now affirm.

## II

In enacting and amending the Act, Congress enlisted all programs receiving federal funds in an effort "to share with handicapped Americans the opportunities for an education, transportation, housing, health care, and jobs that other Americans take for granted." 123 Cong. Rec. 13515 (1977) (statement of Sen. Humphrey). To that end, Congress not only increased federal support for vocational rehabilitation, but also addressed the broader problem of discrimination against the handicapped by including § 504, an antidiscrimination provision patterned after Title VI of the Civil Rights

Act of 1964.[2]   Section 504 of the Rehabilitation Act reads in pertinent part:

"No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U. S. C. § 794.

In 1974 Congress expanded the definition of "handicapped individual" for use in § 504 to read as follows:[3]

---

[2] Congress' decision to pattern § 504 after Title VI is evident in the language of the statute, compare 29 U. S. C. § 794 with 42 U. S. C. § 2000d, and in the legislative history of § 504, see, e. g., S. Rep. No. 93–1297, pp. 39–40 (1974); S. Rep. No. 95–890, p. 19 (1978).   Cf. TenBroek & Matson, The Disabled and the Law of Welfare, 54 Cal. L. Rev. 809, 814–815, and nn. 21–22 (1966) (discussing theory and evidence that "negative attitudes and practices toward the disabled resemble those commonly attached to 'underprivileged ethnic and religious minority groups'").   The range of programs subject to § 504's prohibition is broader, however, than that covered by Title VI, because § 504 covers employment discrimination even in programs that receive federal aid with a primary objective other than the promotion of employment.   See *Consolidated Rail Corporation v. Darrone*, 465 U. S. 624 (1984); Note, Accommodating the Handicapped: Rehabilitating Section 504 after *Southeastern*, 80 Colum. L. Rev. 171, 174–175, and n. 21 (1980).

[3] The primary focus of the 1973 Act was to increase federal support for vocational rehabilitation; the Act's original definition of the term "handicapped individual" reflected this focus by including only those whose disability limited their employability, and those who could be expected to benefit from vocational rehabilitation.   After reviewing the Department of Health, Education, and Welfare's subsequent attempt to devise regulations to implement the Act, however, Congress concluded that the definition of "handicapped individual," while appropriate for the vocational rehabilitation provisions in Titles I and III of the Act, was too narrow to deal with the range of discriminatory practices in housing, education, and health care programs which stemmed from stereotypical attitudes and ignorance about the handicapped.   S. Rep. No. 93–1297, at 16, 37–38, 50.

"[A]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U. S. C. § 706(7)(B).

The amended definition reflected Congress' concern with protecting the handicapped against discrimination stemming not only from simple prejudice, but also from "archaic attitudes and laws" and from "the fact that the American people are simply unfamiliar with and insensitive to the difficulties confront[ing] individuals with handicaps." S. Rep. No. 93–1297, p. 50 (1974). To combat the effects of erroneous but nevertheless prevalent perceptions about the handicapped, Congress expanded the definition of "handicapped individual" so as to preclude discrimination against "[a] person who has a record of, or is regarded as having, an impairment.[but who] may at present have no actual incapacity at all." *Southeastern Community College* v. *Davis,* 442 U. S. 397, 405–406, n. 6 (1979).[4]

In determining whether a particular individual is handicapped as defined by the Act, the regulations promulgated by the Department of Health and Human Services are of significant assistance. As we have previously recognized, these regulations were drafted with the oversight and approval of Congress, see *Consolidated Rail Corporation* v. *Darrone,* 465 U. S. 624, 634–635, and nn. 14–16 (1984); they provide "an important source of guidance on the meaning of § 504." *Alexander* v. *Choate,* 469 U. S. 287, 304, n. 24 (1985). The

---

[4] See *id.,* at 39 ("This subsection includes within the protection of sections 503 and 504 those persons who do not in fact have the condition which they are perceived as having, as well as those persons whose mental or physical condition does not substantially limit their life activities and who thus are not technically within clause (A) in the new definition. Members of both of these groups may be subjected to discrimination on the basis of their being regarded as handicapped"); *id.,* at 37–39, 63–64; see also 120 Cong. Rec. 30531 (1974) (statement of Sen. Cranston).

regulations are particularly significant here because they define two critical terms used in the statutory definition of handicapped individual.[5] "Physical impairment" is defined as follows:

> "[A]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genitourinary; hemic and lymphatic; skin; and endocrine." 45 CFR § 84.3(j)(2)(i) (1985).

In addition, the regulations define "major life activities" as

> "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." § 84.3(j)(2)(ii).

## III

Within this statutory and regulatory framework, then, we must consider whether Arline can be considered a handicapped individual. According to the testimony of Dr.

---

[5] In an appendix to these regulations, the Department of Health and Human Services explained that it chose not to attempt to "set forth a list of specific diseases and conditions that constitute physical or mental impairments because of the difficulty of ensuring the comprehensiveness of any such list." 45 CFR pt. 84, Appendix A, p. 310 (1985). Nevertheless, the Department went on to state that "such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, [and] emotional illness" would be covered. *Ibid.* The Department also reinforced what a careful reading of the statute makes plain, "that a physical or mental impairment does not constitute a handicap for purposes of section 504 unless its severity is such that it results in a substantial limitation of one or more major life activities." *Ibid.* Although many of the comments on the regulations when first proposed suggested that the definition was unreasonably broad, the Department found that a broad definition, one not limited to so-called "traditional handicaps," is inherent in the statutory definition. *Ibid.*

McEuen, Arline suffered tuberculosis "in an acute form in such a degree that it affected her respiratory system," and was hospitalized for this condition. App. 11. Arline thus had a physical impairment as that term is defined by the regulations, since she had a "physiological disorder or condition . . . affecting [her] . . . respiratory [system]." 45 CFR § 84.3(j)(2)(i) (1985). This impairment was serious enough to require hospitalization, a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment. Thus, Arline's hospitalization for tuberculosis in 1957 suffices to establish that she has a "record of . . . impairment" within the meaning of 29 U. S. C. § 706(7)(B)(ii), and is therefore a handicapped individual.

Petitioners concede that a contagious disease may constitute a handicapping condition to the extent that it leaves a person with "diminished physical or mental capabilities," Brief for Petitioners 15, and concede that Arline's hospitalization for tuberculosis in 1957 demonstrates that she has a record of a physical impairment, see Tr. of Oral Arg. 52–53. Petitioners maintain, however, that Arline's record of impairment is irrelevant in this case, since the school board dismissed Arline not because of her diminished physical capabilities, but because of the threat that her relapses of tuberculosis posed to the health of others.[6]

---

[6] See Brief for Petitioners 15–16 (Act covers conditions that leave individuals with "diminished physical or mental capabilities," but not conditions that could "impair the health of others"); Pet. for Cert. 13–14 ("[T]he concept of a 'handicap' [should be limited] to physical and mental conditions which result in either a real or perceived diminution of an individual's capabilities. . . . [A]n individual suffering from a contagious disease may not necessarily suffer from any physical or mental impairments affecting his ability to perform the job in question. In other words, an employer's reluctance to hire such an individual is not due to any real or perceived inability on the individual's part, but rather because of the employer's reluctance to expose its other employees and its clientele to the threat of infection").

We do not agree with petitioners that, in defining a handicapped individual under § 504, the contagious effects of a disease can be meaningfully distinguished from the disease's physical effects on a claimant in a case such as this. Arline's contagiousness and her physical impairment each resulted from the same underlying condition, tuberculosis. It would be unfair to allow an employer to seize upon the distinction between the effects of a disease on others and the effects of a disease on a patient and use that distinction to justify discriminatory treatment.[7]

Nothing in the legislative history of § 504 suggests that Congress intended such a result. That history demonstrates that Congress was as concerned about the effect of an impairment on others as it was about its effect on the individual. Congress extended coverage, in 29 U. S. C. § 706(7) (B)(iii), to those individuals who are simply "regarded as having" a physical or mental impairment.[8] The Senate Report provides as an example of a person who would be covered under this subsection "a person with some kind of visible physical impairment which in fact does not substantially limit that person's functioning." S. Rep. No. 93–1297, at 64.[9]

---

[7] The United States argues that it is possible for a person to be simply a carrier of a disease, that is, to be capable of spreading a disease without having a "physical impairment" or suffering from any other symptoms associated with the disease. The United States contends that this is true in the case of some carriers of the Acquired Immune Deficiency Syndrome (AIDS) virus. From this premise the United States concludes that discrimination solely on the basis of contagiousness is never discrimination on the basis of a handicap. The argument is misplaced in this case, because the handicap here, tuberculosis, gave rise both to a physical impairment *and* to contagiousness. This case does not present, and we therefore do not reach, the questions whether a carrier of a contagious disease such as AIDS could be considered to have a physical impairment, or whether such a person could be considered, solely on the basis of contagiousness, a handicapped person as defined by the Act.

[8] See n. 4, *supra.*

[9] Congress' desire to prohibit discrimination based on the effects a person's handicap may have on others was evident from the inception of the

Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment.[10]

---

Act. For example, Representative Vanik, whose remarks constitute "a primary signpost on the road toward interpreting the legislative history of § 504," *Alexander* v. *Choate,* 469 U. S. 287, 295–296, and n. 13 (1985), cited as an example of improper handicap discrimination a case in which "a court ruled that a cerebral palsied child, who was not a physical threat and was academically competitive, should be excluded from public school, because his teacher claimed his physical appearance 'produced a nauseating effect' on his classmates." 117 Cong. Rec. 45974 (1971). See also 118 Cong. Rec. 36761 (1972) (remarks of Sen. Mondale) (a woman "crippled by arthritis" was denied a job not because she could not do the work but because "college trustees [thought] 'normal students shouldn't see her'"); *id.,* at 525 (remarks of Sen. Humphrey); cf. Macgregor, Some Psycho-Social Problems Associated with Facial Deformities, 16 Am. Sociological Rev. 629 (1961).

[10] The Department of Health and Human Services regulations, which include among the conditions illustrative of physical impairments covered by the Act "cosmetic disfigurement," lend further support to Arline's position that the effects of one's impairment on others is as relevant to a determination of whether one is handicapped as is the physical effect of one's handicap on oneself. 45 CFR § 84.3(j)(2)(i)(A) (1985). At oral argument, the United States took the position that a condition such as cosmetic disfigurement could not substantially limit a major life activity within the meaning of the statute, because the only major life activity that it would affect would be the ability to work. The United States recognized that "working" was one of the major life activities listed in the regulations, but said that to argue that a condition that impaired *only* the ability to work was a handicapping condition was to make "a totally circular argument which lifts itself by its bootstraps." Tr. of Oral Arg. 15–16. The argument is not circular, however, but direct. Congress plainly intended the Act to cover persons with a physical or mental impairment (whether actual, past, or perceived) that substantially limited one's ability to work. "[T]he primary goal of the Act is to increase employment of the handicapped." *Consolidated Rail Corporation* v. *Darrone,* 465 U. S., at 633, n. 13; see also *id.,* at 632 ("Indeed, enhancing employment of the handicapped was so much the focus of the 1973 legislation that Congress the next year felt it necessary to amend the statute to clarify whether § 504 was intended to prohibit other types of discrimination as well").

Allowing discrimination based on the contagious effects of a physical impairment would be inconsistent with the basic purpose of § 504, which is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others. By amending the definition of "handicapped individual" to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment.[11] Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness.[12] Even those who suffer or have recovered from such noninfectious diseases as epilepsy or cancer have faced discrimination based on the irrational fear that they might be contagious.[13] The Act is

---

[11] S. Rep. No. 93–1297, at 50; see n. 4, *supra.* See generally, TenBroek & Matson, 54 Cal. L. Rev., at 814; Strauss, Chronic Illness, in The Sociology of Health and Illness 138, 146–147 (P. Conrad & R. Kern eds. 1981).

[12] The isolation of the chronically ill and of those perceived to be ill or contagious appears across cultures and centuries, as does the development of complex and often pernicious mythologies about the nature, cause, and transmission of illness. Tuberculosis is no exception. See R. Dubos & J. Dubos, The White Plague (1952); S. Sontag, Illness as Metaphor (1978).

[13] Senator Humphrey noted the "irrational fears or prejudice on the part of employers or fellow workers" that make it difficult for former cancer patients to secure employment. 123 Cong. Rec. 13515 (1977). See also Feldman, Wellness and Work, in Psychosocial Stress and Cancer 173–200 (C. Cooper ed. 1984) (documenting job discrimination against recovered cancer patients); S. Sontag, *supra,* at 6 ("Any disease that is treated as a mystery and acutely enough feared will be felt to be morally, if not literally, contagious. Thus, a surprisingly large number of people with cancer find themselves being shunned by relatives and friends . . . as if cancer, like TB, were an infectious disease"); Dell, Social Dimensions of Epilepsy: Stigma and Response, in Psychopathology in Epilepsy: Social Dimensions 185–210 (S. Whitman & B. Hermann eds. 1986) (reviewing range of discrimination affecting epileptics); Brief for Epilepsy Foundation of

carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments: the definition of "handicapped individual" is broad, but only those individuals who are both handicapped *and* otherwise qualified are eligible for relief. The fact that *some* persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act *all* persons with actual or perceived contagious diseases. Such exclusion would mean that those accused of being contagious would never have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they were "otherwise qualified." Rather, they would be vulnerable to discrimination on the basis of mythology—precisely the type of injury Congress sought to prevent.[14] We conclude that

America as *Amicus Curiae* 5–14 ("A review of the history of epilepsy provides a salient example that fear, rather than the handicap itself, is the major impetus for discrimination against persons with handicaps").

[14] Congress reaffirmed this approach in its 1978 amendments to the Act. There, Congress recognized that employers and other grantees might have legitimate reasons not to extend jobs or benefits to drug addicts and alcoholics, but also understood the danger of improper discrimination against such individuals if they were categorically excluded from coverage under the Act. Congress therefore rejected the original House proposal to exclude addicts and alcoholics from the definition of handicapped individual, and instead adopted the Senate proposal excluding only those alcoholics and drug abusers "whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment . . . would constitute a direct threat to property or the safety of others." 29 U. S. C. § 706(7)(B). See 124 Cong. Rec. 30322 (1978); Brief for Senator Cranston et al. as *Amici Curiae* 35–36; 43 Op. Atty. Gen. No. 12 (1977).

This approach is also consistent with that taken by courts that have addressed the question whether the Act covers persons suffering from conditions other than contagious diseases that render them a threat to the safety of others. See, *e. g., Strathie* v. *Department of Transportation,* 716 F. 2d 227, 232–234 (CA3 1983); *Doe* v. *New York University,* 666 F. 2d 761, 775 (CA2 1981).

the fact that a person with a record of a physical impairment is also contagious does not suffice to remove that person from coverage under § 504.[15]

---

[15] The dissent implies that our holding rests only on our "own sense of fairness and implied support from the Act," *post*, at 289, and that this holding is inconsistent with *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981). It is evident, however, that our holding is premised on the plain language of the Act, and on the detailed regulations that implement it, neither of which the dissent discusses and both of which support the conclusion that those with a contagious disease such as tuberculosis may be considered "handicapped" under the Act. We also find much support in the legislative history, while the dissent is unable to find any evidence to support its view. Accordingly, the dissent's construction of the Act to exclude those afflicted with a contagious disease is not only arbitrary (and therefore unfair) but unfaithful to basic canons of statutory construction.

Nothing in *Pennhurst* requires such infidelity. The statutory provision at issue there was held to be "simply a general statement of 'findings'" and to express "no more than . . . a congressional preference for certain kinds of treatment." *Id.*, at 19. See *Wright* v. *Roanoke Redevelopment and Housing Auth.*, 479 U. S. 418, 423 (1987) ("In *Pennhurst* . . . the statutory provisions were thought to be only statements of 'findings' indicating no more than a congressional preference—at most a 'nudge in the preferred directio[n]'"). The contrast between the congressional preference at issue in *Pennhurst* and the antidiscrimination mandate of § 504 could not be more stark.

Nor is there any reason to think that today's decision will extend the Act beyond manageable bounds. Construing § 504 not to exclude those with contagious diseases will complement rather than complicate state efforts to enforce public health laws. As we state, *infra*, at 288, courts may reasonably be expected normally to defer to the judgments of public health officials in determining whether an individual is otherwise qualified unless those judgments are medically unsupportable. Conforming employment decisions with medically reasonable judgments can hardly be thought to threaten the States' regulation of communicable diseases. Indeed, because the Act requires employers to respond rationally to those handicapped by a contagious disease, the Act will assist local health officials by helping remove an important obstacle to preventing the spread of infectious diseases: the individual's reluctance to report his or her condition. It is not surprising, then, that in their brief as *amici curiae* in support of respondent, the States of California, Maryland, Michigan, Minnesota, New

## IV

The remaining question is whether Arline is otherwise qualified for the job of elementary schoolteacher. To answer this question in most cases, the district court will need to conduct an individualized inquiry and make appropriate findings of fact. Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks.[16] The basic factors to be considered in conducting this inquiry are well established.[17] In the con-

Jersey, New York, and Wisconsin conclude that "inclusion of communicable diseases within the ambit of Section 504 does not reorder the priorities of state regulatory agencies . . . [and] would not alter the balance between state and federal authority." Brief for State of California et al. 30.

[16] A person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk. The Act would not require a school board to place a teacher with active, contagious tuberculosis in a classroom with elementary schoolchildren. Respondent conceded as much at oral argument. Tr. of Oral Arg. 45.

[17] "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College* v. *Davis*, 442 U. S. 397, 406 (1979). In the employment context, an otherwise qualified person is one who can perform "the essential functions" of the job in question. 45 CFR § 84.3(k) (1985). When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any "reasonable accommodation" by the employer would enable the handicapped person to perform those functions. *Ibid.* Accommodation is not reasonable if it either imposes "undue financial and administrative burdens" on a grantee, *Southeastern Community College* v. *Davis*, 442 U. S., at 412, or requires "a fundamental alteration in the nature of [the] program," *id.*, at 410. See 45 CFR § 84.12(c) (1985) (listing factors to consider in determining whether accommodation would cause undue hardship); 45 CFR pt. 84, Appendix A, p. 315 (1985) ("[W]here reasonable accommodation does not overcome the effects of a person's handicap, or where reasonable accommodation causes undue hardship to the employer, failure to hire or promote the handicapped person will not be

text of the employment of a person handicapped with a contagious disease, we agree with *amicus* American Medical Association that this inquiry should include

> "[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm." Brief for American Medical Association as *Amicus Curiae* 19.

In making these findings, courts normally should defer to the reasonable medical judgments of public health officials.[18] The next step in the "otherwise-qualified" inquiry is for the court to evaluate, in light of these medical findings, whether the employer could reasonably accommodate the employee under the established standards for that inquiry. See n. 17, *supra.*

Because of the paucity of factual findings by the District Court, we, like the Court of Appeals, are unable at this stage of the proceedings to resolve whether Arline is "otherwise qualified" for her job. The District Court made no findings as to the duration and severity of Arline's condition, nor as to the probability that she would transmit the disease. Nor did the court determine whether Arline was contagious at the time she was discharged, or whether the School Board could

---

considered discrimination"); *Davis, supra,* at 410–413; *Alexander* v. *Choate,* 469 U. S., at 299–301, and n. 19; *Strathie* v. *Department of Transportation,* 718 F. 2d, at 231.

[18] This case does not present, and we do not address, the question whether courts should also defer to the reasonable medical judgments of private physicians on which an employer has relied.

have reasonably accommodated her.[19]   Accordingly, the resolution of whether Arline was otherwise qualified requires further findings of fact.

## V

We hold that a person suffering from the contagious disease of tuberculosis can be a handicapped person within the meaning of § 504 of the Rehabilitation Act of 1973, and that respondent Arline is such a person.   We remand the case to the District Court to determine whether Arline is otherwise qualified for her position.   The judgment of the Court of Appeals is

*Affirmed.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA joins, dissenting.

In *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1 (1981), this Court made clear that, where Congress intends to impose a condition on the grant of federal funds, "it must do so unambiguously." *Id.,* at 17.   This principle applies with full force to § 504 of the Rehabilitation Act, which Congress limited in scope to "those who actually 'receive' federal financial assistance." *United States Department of Transportation* v. *Paralyzed Veterans of America,* 477 U. S. 597, 605 (1986).   Yet, the Court today ignores this principle, resting its holding on its own sense of fairness and implied support from the Act. *Ante,* at 282–286.   Such an approach, I believe, is foreclosed not only by *Pennhurst,* but also by our prior decisions interpreting the Rehabilitation Act.

Our decision in *Pennhurst* was premised on the view that federal legislation imposing obligations only on recipients of

---

[19] Employers have an affirmative obligation to make a reasonable accommodation for a handicapped employee.   Although they are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies.   See n. 17, *supra;* 45 CFR § 84.12 and Appendix A, pp. 315–316 (1985).

federal funds is "much in the nature of a contract."  451
U. S., at 17.   See also *Board of Education of Hendrick Hudson Central School District* v. *Rowley,* 458 U. S. 176, 204,
n. 26 (1982).   As we have stated in the context of the Rehabilitation Act, "'Congress apparently determined it would
require . . . grantees to bear the costs of providing employment for the handicapped as a *quid pro quo* for the receipt of
federal funds.'"   *United States Department of Transportation* v. *Paralyzed Veterans of America, supra,* at 605, quoting *Consolidated Rail Corporation* v. *Darrone,* 465 U. S. 624,
633, n. 13 (1984).   The legitimacy of this *quid pro quo* rests on
whether recipients of federal funds voluntarily and knowingly
accept the terms of the exchange.  *Pennhurst, supra,* at 17.
There can be no knowing acceptance unless Congress speaks
"with a clear voice" in identifying the conditions attached to
the receipt of funds.   451 U. S., at 17.

The requirement that Congress unambiguously express
conditions imposed on federal moneys is particularly compelling in cases such as this where there exists longstanding
state and federal regulation of the subject matter.   From as
early as 1796, Congress has legislated directly in the area of
contagious diseases.[1]   Congress has also, however, left significant leeway to the States, which have enacted a myriad of
public health statutes designed to protect against the introduction and spread of contagious diseases.[2]   When faced

---

[1] See, *e. g.,* 42 U. S. C. §§ 243, 264; Act of May 27, 1796, ch. 31, 1 Stat.
474; see generally Morgenstern, The Role of the Federal Government in
Protecting Citizens from Communicable Diseases, 47 U. Cin. L. Rev. 537
(1978).

[2] The coverage of state statutes regulating contagious diseases is broad,
addressing, *inter alia,* reporting requirements, quarantines, denial of marriage licenses based on the presence of certain diseases, compulsory immunization, and certification and medical testing requirements for school employees.  See, *e. g.,* Ariz. Rev. Stat. Ann. § 36.621 *et seq.* (1986) (reporting
requirements); Conn. Gen. Stat. §§ 19a–207, 19a–221 (1985) (quarantines);
Fla. Stat. §§ 741.051–741.055 (1985) (marriage licenses); Mass. Gen. Laws
§ 71:55B (1984) (certification requirements for school employees); Miss.

with such extensive regulation, this Court has declined to read the Rehabilitation Act expansively. See *Bowen* v. *American Hospital Assn.*, 476 U. S. 610, 642–647 (1986); *Alexander* v. *Choate*, 469 U. S. 287, 303, 307 (1985). Absent an expression of intent to the contrary, "Congress . . . 'will not be deemed to have significantly changed the federal-state balance.'" *Bowen* v. *American Hospital Assn., supra,* at 644, quoting *United States* v. *Bass*, 404 U. S. 336, 349 (1971).

Applying these principles, I conclude that the Rehabilitation Act cannot be read to support the result reached by the Court. The record in this case leaves no doubt that Arline was discharged because of the contagious nature of tuberculosis, and not because of any diminished physical or mental capabilities resulting from her condition.[3] Thus, in the language of § 504, the central question here is whether discrimination on the basis of contagiousness constitutes discrimination "by reason of . . . handicap." Because the language of the Act, regulations, and legislative history are

---

Code Ann. § 37–7–301(i) (Supp. 1986) (compulsory immunization of school students); W. Va. Code § 16–3–4a (1985) (medical testing).

[3] In testifying concerning his reasons for recommending Arline's termination, petitioner Craig Marsh, Superintendent of Schools of Nassau County, Florida, stated that "I felt like that for the benefit of the total student population and . . . personnel in Nassau County and the public benefit, that it would be best if—not to continue or offer Mrs. Arline any employment." App. 62. Marsh added:

"I am charged and so is the school board, with the responsibility for the protecting, the safety, health and welfare of students, every student in Nassau County. And the record clearly states that, you know, after all—after the third time that I had knowledge of Mrs. Arline's recurring condition, which was infectious at the time of each reoccurrence, that I felt like it [was] in the best interest of the school system of Nassau County that she be dismissed from the classroom." *Id.,* at 81.

Before Arline's termination, Marsh consulted with Dr. Marianne McEuen, who testified that she recommended the termination because of the threat that Arline's condition posed to the health of the small children with whom Arline was in constant contact. *Id.,* at 12–17.

silent on this issue,[4] the principles outlined above compel the conclusion that contagiousness is not a handicap within the meaning of § 504. It is therefore clear that the protections of the Act do not extend to individuals such as Arline.

In reaching a contrary conclusion, the Court never questions that Arline was discharged because of the threat her condition posed to others. Instead, it posits that the contagious effects of a disease cannot be "meaningfully" distinguished from the disease's effect on a claimant under the Act. *Ante*, at 282. To support this position, the Court observes that Congress intended to extend the Act's protections to individuals who have a condition that does not impair their mental and physical capabilities, but limits their major life activities because of the adverse reactions of others. This congressional recognition of a handicap resulting from the reactions of others, we are told, reveals that Congress intended the Rehabilitation Act to regulate discrimination on the basis of contagiousness. *Ante*, at 284.

This analysis misses the mark in several respects. To begin with, Congress' recognition that an individual may be handicapped under the Act solely by reason of the reactions of others in no way demonstrates that, for the purposes of interpreting the Act, the reactions of others to the condition cannot be considered separately from the effect of the condition on the claimant. In addition, the Court provides no basis for extending the Act's generalized coverage of individuals suffering discrimination as a result of the reactions of others to coverage of individuals with contagious diseases. Although citing examples of handicapped individuals described in the regulations and legislative history, the Court points to nothing in these materials suggesting that Congress contemplated that a person with a condition posing a threat to the health of others may be considered handicapped under

---

[4] See, *e. g.*, 29 U. S. C. § 701 *et seq.*; 45 CFR pt. 84 (1985); H. R. Rep. No. 95–1149 (1978); S. Rep. No. 95–890 (1978); S. Rep. No. 93–1297 (1974); H. R. Rep. No. 93–244 (1973); S. Rep. No. 93–318 (1973).

the Act.[5] Even in an ordinary case of statutory construction, such meager proof of congressional intent would not be determinative. The Court's evidence, therefore, could not possibly provide the basis for "knowing acceptance" by such entities as the Nassau County School Board that their receipt of federal funds is conditioned on Rehabilitation Act regulation of public health issues. *Pennhurst*, 451 U. S., at 17.

In *Alexander* v. *Choate, supra,* at 299, this Court stated that "[a]ny interpretation of § 504 must . . . be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." The Court has wholly disregarded this admonition here.

---

[5] In fact, two of the examples cited by the Court may be read to support a contrary conclusion. The 1978 amendments to the Rehabilitation Act, cited by the majority, *ante,* at 285, n. 14, specifically exclude from the definition of a handicapped person alcoholics and drug abusers that "constitute a *direct threat to* property or *the safety of others.*" 29 U. S. C. § 706(7)(B) (emphasis added). If anything, this exclusion evinces congressional intent to avoid the Act's interference with public health and safety concerns. See Oversight Hearings on Rehabilitation Act of 1973 before the Subcommittee on Select Education of the House Committee on Education and Labor, 95th Cong., 2d Sess., 503 (1978) (statement of Rep. Hyde) ("Congress needs to give thoughtful and wide-ranging consideration to the needs of handicapped persons, balanced against the realities of public safety, economics, and commonsense"). This intent is also present in the statements of Representative Vanik relied on by the Court. See *ante,* at 283, n. 9. Representative Vanik expressed apparent disapproval of a court ruling that " 'a cerebral palsied child, *who was not a physical threat* and was academically competitive, should be excluded from public school, because his teacher claimed his physical appearance "produced a nauseating effect" on his classmates.' " *Ante,* at 283, n. 9, quoting 117 Cong. Rec. 45974 (1971) (emphasis added).