**Gene H. ARLINE, Plaintiff,**

v.

**SCHOOL BOARD OF NASSAU COUNTY and Craig Marsh, etc., Defendants.**

No. 82–305–Civ–J–16.

United States District Court, M.D. Florida, Jacksonville Division.

July 1, 1988.

Philip J. Padovano, Tallahassee, Fla., George K. Rahdert, St. Petersburg, Fla., for plaintiff.

Brian T. Hayes, Monticello, Fla., for defendants.

## OPINION AND ORDER

JOHN H. MOORE, II, District Judge.

The above-styled cause came to be heard on May 17 and 18, 1988 on the issue of whether Plaintiff was "otherwise qualified" for the position of elementary school teacher, pursuant to the mandate of the United States Supreme Court. *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In this particular case, a "person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for [the] job if reasonable accommodation will not eliminate that risk." *Id.,* 107 S.Ct. at 1131 n. 16.

### FINDINGS OF FACT

A. Tuberculosis

1. Infection and Disease

Tuberculosis is a disease caused by an infection with a microbe known as microbacterium tuberculosis. The infection begins with the inhalation by one person of "droplet nuclei" expelled by another. Droplet nuclei are tuberculosis germs suspended in moisture. Spreading the infection, or communication, is quite difficult. What makes communication so difficult is that when droplet nuclei are expelled from one person, almost all, or 99.9%, of the nuclei die within a second of contacting room air. The droplet nuclei that survive must reach the distal portion, which is the microscopic air space, of the lungs of the person inhaling the germs. This is accomplished when the germs by-pass the efficient filtering action of the lungs' protective structures. If any germ does reach

the distal portion of the lungs, the body's immunological defenses are capable of rendering it harmless.

If a tuberculosis germ successfully implants itself into the distal portion of the lungs, and the immunological defenses of the body do not destroy it, the germ can then multiply. If this occurs, the person is infected. If the germs continue to multiply, at some point the number of tuberculosis cells becomes so great as to cause disease. Infection developing into disease is a very rare occurrence, however. Only about 5% of those people infected will actually progress to disease within the first two years after infection. Only another 5% will progress to disease over their remaining lifetimes. Tuberculosis disease will manifest itself by causing an unexplained loss of weight, a fever, a cough, and fatigue.

2. Tests for Tuberculosis

Three tests are used to determine the presence of tuberculosis. The first is the skin test. This, basically, is a screening test to determine the presence of the tuberculosis organism in the body. The test gives no information as to when the infection occurred, whether the person presently is infected, or whether disease is or was present due to the infection. The skin test only provides information that the body has seen a tuberculosis germ some time in the past.

Two major types of skin tests exist. One type is known as Mono–Vacc. The test is administered by pressing a small object that has four tiny tines onto the skin. The tines deliver tuberculin into the skin. If the skin reacts to the tuberculin, the person is said to test positive. Mono–Vacc is not considered reliable because, for example, the amount of tuberculin administered cannot be regulated. How hard the tines are pressed into the skin, and whether the tines scratch the skin both can make differences in the results of the test.

The second type of skin test is the intradermal PPD test in which a small amount of tuberculin is placed directly under the skin. This test is more reliable than the Mono–Vacc test; however, the overall reliability of the PPD test depends upon the manufacturer's material. One material is known to give false positive test results. Also, these tests are reliable only if the same manufacturer's material is always used on the same person.

The second type of test for tuberculosis is the sputum culture. A patient's sputum is placed on a laboratory dish and allowed to "grow" for a number of weeks. The organism grown on culture indicates that the person from whom the specimen came is, at present, infected with tuberculosis. A culture is grown for up to eight weeks. If no growth is detected within the eight weeks, the sputum culture is negative. If growth is detected during the eight week period, the culture is allowed to continue to grow until there is a large enough culture to test. Usually growth is detected by the sixth week.

A positive culture does not necessarily indicate that the organism is present in large enough numbers, or colonies, to pose more than a slight chance that the infection could be communicated to another person. Communicability is determined by the actual number of colonies detected. If the number of colonies grown on a culture is small, the ability to communicate is small. A culture can grow just one colony, but a person is not considered to be able to communicate the infection unless a vastly larger number of organisms are present.

The test that will quickly determine a large number of organisms is known as the sputum smear test. This test is considered the threshold indicator of a person's communicability because the sputum smear test is not very sensitive, and thus, many organisms need to be present before the test is positive.

3. Communication of Tuberculosis

The communicability of tuberculosis from one person to another is a matter of degree, depending principally upon whether the patient's sputum smears show large numbers of organisms and whether the patient is on medication. As stated earlier, positive sputum smear is considered the threshold indicator that a person infected

with the tuberculosis germ is capable of communicating it.

Medication is an important factor in communication of tuberculosis because once a person begins medical treatment for tuberculosis, the risk of communicability becomes very small. Within two weeks of drug therapy, 99% of sputum organisms are killed. In addition, the medication quickly stops the patient's cough. Therefore, the risk is reduced in two ways. The number of organisms is reduced, and the "propulsion mechanism", or the cough that allows the germs to get to other people, is reduced.

When a patient tests *smear positive* and *culture positive*, the probability of communication is the highest. Therefore, medical treatment should begin immediately. The first specimens received after treatment begins usually are still smear positive, culture positive. In a few weeks' time the specimens become smear negative, culture positive. A little later still and the smear is negative and the culture is negative, although tests may be interspersed with an occasional positive culture. Finally, both the smear and culture become negative; however, it is not highly unusual that a patient will have a random positive culture during the latter part of chemotherapy. A patient who has a positive culture under these circumstances is not considered to have relapsed, and is not considered a risk. An accepted medical fact is that a patient who is smear negative and culture positive is not communicable.

Communicability also depends upon environmental factors. The people at the highest risk of infection are household members who sleep in the same house, spend the most time with, and are in close proximity to the actively communicable person. The size of the room in which people are, and the amount of time spent with the communicable person must be considered. Thus, family members who normally spend, at the least, 12 hours together are at a much greater risk than anyone else coming into contact with a communicable person.

4. Medical Treatment of Tuberculosis

In the late 1940's, the medication streptomycin was introduced to treat tuberculosis. In the fifties, additional drugs were introduced; namely isoniazid and para-aminosalicylic acid (hereinafter PAS). The result from these drugs was very good; however, by the 1970's the medical profession knew that the drugs used in the 1940's and 1950's were weak. The therapy used in the 1940's and 1950's resulted in a number of relapses in later years. By the 1970's, more than six medications were available, and those same medications are used today. Moreover, in the 1970's doctors learned to prescribe the medications in varying combinations depending upon the patient.

As a result of the better medicine and treatment, the relapse rate has decreased to about twenty per cent of what it used to be. The chemotherapy available today has reduced the incidence of infection to 5%–10% in the adult population, .2%–.3% in elementary school age children, and 3%–4% in high school age children. The medicine available today is very efficient (98.6% efficacy rate) in halting the tuberculosis infection from progressing. Thus, the progression to disease also can be eliminated if the medication is administered in a timely fashion. Finally, even if the patient progresses to the disease stage, tuberculosis is curable.

B. The Plaintiff

1. Medical History

Plaintiff was hospitalized for tuberculosis from May of 1957 until August of 1958. She was treated with isoniazid and PAS while in the hospital. PAS was continued until February, 1959, and isoniazid was continued until July, 1960. The Duval County Health Department continuously tested Plaintiff for tuberculosis until September 1975.

In the summer of 1977, Plaintiff suffered a relapse of tuberculosis. She was hospitalized, and treated with isoniazid, ethambutol and streptomycin. Ethambutol was not available in 1957 when Plaintiff was first treated. As stated earlier, this additional drug and the updated methods of

treatment are much more effective than what Plaintiff received in 1957.

Treatment with isoniazid and ethambutol continued after Plaintiff was released from the hospital, and she was tested continuously for tuberculosis. In March of 1978 a culture tested positive with over one hundred colonies of tuberculosis. Additional drugs were added to the regimen that Plaintiff was taking, and testing was continued. In November, 1978 another culture tested positive with only one colony of tuberculosis. This particular culture was grown for thirteen weeks. Another specimen taken that same day tested negative. Plaintiff's medical treatment was not altered as a result of the one colony culture.

Plaintiff continued the antituberculous treatment until November, 1980. She also continued to be tested for tuberculosis. No subsequent cultures tested positive. Of even more importance, however, is the fact that Plaintiff did not have a positive smear test after August, 1977. Testing by the county health department stopped in May of 1981.

Plaintiff's husband and two sons, ages six and seven, were skin-tested in 1977 after she had the relapse of tuberculosis. All of them tested negative. The family was tested again in 1988 (Plaintiff now has an additional son, age seven). All members again tested negative. The test was a PPD intradermal skin test. The doctor that performed the skin test in 1988 testified that Plaintiff and her family reside in a "very small, humble abode." The doctor further testified that they resided in the same home in the 1970's.

### 2. Professional History

In 1966, Plaintiff became a continuing contract teacher employed by the Nassau County School Board. She held then, and holds now, certification from the State of Florida, Department of Education in elementary education only. When she suffered the relapse of tuberculosis in 1977, school was not in session, as it was summer. When the culture tested positive with over one hundred colonies in March of 1978, the results of which were first available on May 19, 1978, Defendant suspended Plaintiff with pay for the remainder of the school year. Again, with the positive culture of one colony taken in November, 1978, the results of which were available on February 13, 1979, the school board suspended Plaintiff with pay for the remainder of that school year.

At the end of that school year, Defendant held a hearing, and decided to terminate Plaintiff. The determination was made solely on the basis of her history of tuberculosis and not because of any misfeasance, malfeasance, inadequate performance, or inability to perform the essential functions of her teaching job. Plaintiff appealed the termination decision and the State Board of Education remanded her case to the Nassau County School Board. Upon reconsideration, the Nassau County School Board again decided to terminate Plaintiff's contract.

In 1977 and 1978, the school children who attended the school where Plaintiff taught were skin tested for tuberculosis, and the results of these tests were discussed at trial. The Court finds that the tests are scientifically inaccurate and insignificant. The history of each child tested is unknown; the results do not indicate whether any particular child ever tested positive before, whether the same type of test, i.e., the PPD intradermal or Mono-Vacc, was used in previous testing, or, if the test was a PPD interdermal test, whether the same antigen was used from one test to another. Another problem with the tests is that a complete record of exactly who was tested from one year to the next was not available. One year eighteen students were tested. The following year fourteen students were tested. The Court cannot tell from the results if the fourteen students were all part of the eighteen tested the year before.

### CONCLUSIONS OF LAW

The only issue before this Court is whether Plaintiff was and is otherwise qualified for the job of elementary school teacher. "An otherwise qualified person is one who is able to meet all of a program's

requirements in spite of [the] handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). In the context of a person handicapped with a history of a communicable disease, the Supreme Court enumerated a standard of inquiry.

> This Court must evaluate the following: [findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause the varying degrees of harm.

*Arline*, 107 S.Ct. at 1131 (quoting brief for American Medical Association as *Amicus Curiae* 19).

An important focus of this Court's inquiry revolves around the "findings of facts, based on reasonable medical judgments given the state of medical knowledge." This Court must make its conclusions of law based upon the reasonable medical judgments given the state of the medical knowledge of 1978, and not upon the state of medical knowledge of 1988. Fortunately, both parties were very careful when presenting their evidence to clarify what was within the medical knowledge in 1978, and what is a new discovery since that time. Unless this Court states otherwise, the conclusions of law are based upon facts known to the medical professionals in 1978.

### (a) Nature of the Risk

Tuberculosis is not easily communicated. The people most at risk are family members of an infectious person because they spend the most time in an enclosed area with the person. In Plaintiff's case, none of the family members became infected with tuberculosis despite the fact that they lived in a small home, and despite the fact that Plaintiff was diseased and was capable of communicating tuberculosis in the summer of 1977. Moreover, the family members were tested in 1988, and still have never been infected with tuberculosis.

Another factor to consider in determining the nature of the risk is whether the person infected with tuberculosis is on medication, and whether the smear and culture tests are negative. After Plaintiff returned to her teaching position in the fall of 1977, she was on medication and did not have positive smear tests. In addition, after Plaintiff had the positive culture of one colony, the results of all further culture tests were negative. Before the School Board decided to terminate Plaintiff, it had the results of at least ten additional cultures, all of which were negative.

### (b) Duration of the Risk

A person is capable of communicating tuberculosis when the smear test is positive, and thus, when the person is diseased. Within a few weeks after chemotherapy begins and the patient's smear test becomes negative, the chance that the patient will communicate tuberculosis to others is extremely rare. Plaintiff's smear test became negative in August, 1977, and never was positive again. Thus, the duration of the risk of communication by Plaintiff was through the summer of 1977.

### (c) Severity of the Risk

When a person became infected with tuberculosis in 1977–78, a medical treatment was administered. When a person becomes infected with tuberculosis today, the same medical treatment is administered. In 1977–78, the treatment was known to be much more effective than the treatment in the 1950's. Now, after ten years of further research, the medical community can state that this treatment has been found to be 98.6% efficient in eliminating the progression of infection to disease. Moreover, a person who becomes infected and is timely treated will suffer no physical harm.

If the patient progresses to the disease stage, medical treatment is available to cure the disease. Again, a person who has a tuberculosis infection that progresses to disease, and is timely treated for that disease, will have a very little risk of harm. Thus, the Court concludes that the risk was

not severe in 1978, and is not severe at present.

### (d) The Probabilities of Transmission and Harm

The Court concludes that Plaintiff posed no threat of communicating tuberculosis to the schoolchildren she was teaching. Even when Plaintiff had the positive cultures in 1978, the probability that she would transmit tuberculosis to anyone was so extremely small as to not exist. Plaintiff's smear tests were negative, the positive culture of November 1978 had only one colony and was surrounded by negative cultures taken the same day and in adjoining months, Plaintiff was on medication, none of her family tested positive for tuberculosis, and the exposure to the students was of a limited time.

In concluding that the probability that Plaintiff could communicate tuberculosis did not exist in 1978, the Court also concludes that the probability that Plaintiff could harm the schoolchildren did not exist in 1978. Moreover, the risk of communication of tuberculosis by Plaintiff and the risk of harm to others at present does not exist. All experts who testified at trial, including those called by the defense, stated that Plaintiff is cured of tuberculosis.

In balancing all of the factors considered above, the Court concludes that Plaintiff was otherwise qualified to teach in the Nassau County public schools in 1978 and is otherwise qualified to teach at present. The Court further concludes that the decision to terminate Plaintiff because of her history of tuberculosis was not based on reasonable medical judgments, but rather was based upon "society's accumulated myths and fears about [tuberculosis]." *Arline*, 107 S.Ct. at 1129. The accumulated myths and fears about tuberculosis are quite understandable given the frightening history of the disease. The United States Congress and the United States Supreme Court have spoken, however, and this Court must, and shall, uphold the law. Therefore, Plaintiff is entitled to relief under 29 U.S.C. § 794.

## DAMAGES

■ Plaintiff testified at trial that she attempted to find a teaching job with the Duval County public school system in 1979, and again in 1983. Both of these attempts were unsuccessful. Plaintiff also testified that during the years 1979–1983, she became pregnant and only minimally attempted to get jobs outside of her field by applying at approximately two department and grocery stores. These attempts were unsuccessful as well. By her own admission at trial, Plaintiff's attempts to find employment were quite limited and she has not attempted to become employed since 1983. She has never attempted to qualify for a change in her teaching certification in order to be qualified to teach at levels other than elementary school. Thus, the Court concludes that the Plaintiff has failed to mitigate her damages.

The Court finds that Plaintiff is entitled to full back pay, plus benefits, for the four school years commencing with the year 1979–1980, less any time for which she would not have been compensated because of her pregnancy. Due to the lack of evidence, the Court is unable to determine the amount of such damages. Plaintiff's failure to mitigate her damages precludes any award after the four-year period abovementioned.

■ Based upon the medical testimony and the conclusions of this Court, Plaintiff poses no risk to the students at present as she is cured of tuberculosis. Therefore, Plaintiff is entitled to reinstatement to her position as a third grade teacher in the Nassau County School System. The Defendants are afforded the choice of either reinstating Plaintiff, or paying her front pay in lieu of reinstatement. Based upon the expert testimony, which was undisputed, the present value of what Plaintiff would earn from the 1988–89 school year until her retirement at age 65 is $768,724.00.

Accordingly, the Court now

ORDERS AND ADJUDGES:

1. The parties are hereby directed to confer, and report to this Court within 15

days from the date hereof, whether they can agree on the amount of damages for the period of four years commencing with the school year 1979–80. If so, the Court will enter a supplemental order in accordance with their agreement. If not, the Court, upon request, will schedule an evidentiary hearing to determine such damages.

2. That Defendants are hereby ORDERED to reinstate Plaintiff to the position of elementary school teacher with restoration of full seniority, or in lieu thereof, Defendants shall pay to Plaintiff front pay in the amount of $768,724.00.