Donald **LOWELL**, Plaintiff,

v.

**INTERNATIONAL BUSINESS MACHINES CORP.,** Defendant.

No. 2:95–CV–165.

United States District Court, D. Vermont.

Jan. 27, 1997.

Gary D. McQuesten, Valsangiacomo, Detora & McQuesten, P.C., Barre, VT, for plaintiff.

Heather Briggs, Downs, Rachlin & Martin, P.C., Burlington, VT, for defendant.

## OPINION AND ORDER

SESSIONS, District Judge.

Donald Lowell brings this action against his former employer, International Business Machines Corporation ("IBM"), alleging discrimination against a qualified handicapped person, in violation of Vermont's Fair Employment Practices Act ("FEPA"), Vt.Stat. Ann. tit. 21, § 495 (1987 and Supp.1996); retaliatory discharge for having pursued a workers' compensation claim, in violation of Vt.Stat.Ann. tit. 21, § 710 (1987); and violation of a duty of good faith and fair dealing. IBM has moved for summary judgment on all counts of Lowell's complaint. For the reasons that follow, IBM's motion is GRANTED.

## I. FACTUAL BACKGROUND

For the purpose of this summary judgment motion, the Court assumes the following facts are true. Donald Lowell worked for IBM from 1981 until 1994. In 1984 he began working in the Chemical Services Department, and advanced in that department until he was promoted to senior chemical attendant in 1991. During his tenure with IBM, he received many awards for ideas and suggestions which he contributed to the company. Until 1992 his job performance was consistently rated at "2" on a scale of "1" to "4," meaning that he was accounted a "high contributor," whose performance consistently exceeded the requirements of the job.

In July, 1990, while working in the Chemical Services Department, Lowell observed a truck driver who was delivering gas cylinders containing xylene, a toxic and highly flammable substance, lose control of two of the cylinders. Lowell ran to catch the cylinders, and succeeded in breaking their fall, thus avoiding a potentially catastrophic accident. In so doing, he injured his shoulder and knee. His knee has required surgery four times, and has not completely healed.

Because of his knee injury Lowell lost a substantial amount of time from work. Lowell filed a workers' compensation claim, and received temporary total disability payments beginning in October, 1990 and again in January, 1994. As of April, 1994, he had a 43 percent permanent partial disability rating. In October, 1994 he was approved for a lump sum award of permanent partial disability benefits.

In July 1992, following a three month absence from work for surgery on his knee, Lowell received a job performance evaluation in which his overall rating slipped from "2" to "3."[1] His manager remarked in the evaluation that the review was delayed because Lowell had been away from work for three months due to an operation. His next performance evaluation took place in April, 1994. Again Lowell received a rating of "3." Management commented in this evaluation that Lowell had not been able to meet one of his performance goals because he had been out on sick leave for three months in 1994.

When Lowell returned to work after his last surgery, in April, 1994, his second level manager, Donald Sargent, commented sarcastically on his return to work. In the spring of 1994, Lowell, feeling his department was trying to get rid of him, applied for a job in another department at IBM. He did not get the job. Later on he had a conversation with an individual in the personnel department, who speculated that Lowell might have been rejected because he had missed a lot of time from work.

---

1. Both "3" and "2" ratings were considered satisfactory. A "3" rating meant the individual was a "contributor," whose results exceeded requirements at times.

In the fall of 1994, IBM notified its Burlington workers that it would be laying off employees in development, manufacturing support, and administration by the end of the year. IBM managers were given a specific procedure to follow in selecting workers to be laid off. Lowell was one of 300 employees selected for layoff. He was notified of this decision on December 6, 1994, effective February 6, 1995.

Lowell filed suit against IBM in Lamoille County Superior Court in May, 1995, alleging discrimination on the basis of handicap, retaliation for having pursued a workers' compensation claim, and breach of a covenant of good faith and fair dealing in the employment relationship. Following removal of the suit on diversity grounds, IBM moved for summary judgment on all counts of the complaint.

## II. DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986), citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. *Gallo v. Prudential Residential Serv.*, 22 F.3d 1219, 1224 (2d Cir.1994) (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)).

### A. Handicap Discrimination

In Count I, Lowell claims that he was discharged in violation of Vermont's Fair Employment Practices Act ("FEPA"), which prohibits discrimination against a qualified handicapped individual. Title 21, section 495(a)(1) of the Vermont Statutes provides: "It shall be unlawful employment practice, except where a bona fide occupational qualification requires persons of à particular ... physical or mental condition[, f]or any employer ... to discriminate against ... a qualified handicapped individual." Vt. Stat.Ann. tit. 21, § 495(a)(1) (Supp.1996). "Handicapped individual" is defined as "any person who (A) has a physical or mental impairment which substantially limits one or more major life activities; (B) has a history or record of such an impairment; or (C) is regarded as having such an impairment." Vt.Stat.Ann. tit. 21, § 495d(5) (1987). "Qualified handicapped individual" is defined as "an individual with a handicap who is capable of performing the essential functions of the job or jobs for which he is being considered with reasonable accommodation to his handicap." Title 21, § 495d(6).

█ FEPA's handicap discrimination provisions are modeled on federal legislation, and therefore federal case law and regulations provide guidance in construing them. *State v. G.S. Blodgett Co.*, 163 Vt. 175, 656 A.2d 984, 988 (1995); *Hodgdon v. Mt. Mansfield Co.*, 160 Vt. 150, 165, 624 A.2d 1122, 1130 (1993).

█ To establish a claim under FEPA, Lowell must show that he is a qualified handicapped individual, and that he was discharged because of his handicap. *Blodgett*, 656 A.2d at 987. To show that he is a qualified handicapped individual, Lowell must show that he has a physical impairment (or has a history of or is regarded as having an impairment) which substantially limits one or more major life activities. If he can show such a physical impairment, then he must also show that he is capable of performing his job if provided with reasonable accommodation.

Lowell has shown that he has a physical or mental impairment. After four surgeries, his knee is permanently impaired, and climbing stairs or walking on concrete is painful. He has also shown that he has a history or record of this physical impairment. He has

also produced some evidence that IBM regarded him as having a physical impairment, in the comments of his second level manager on his extended absences from work.

■ Lowell, however, has not sustained his burden of showing that this impairment substantially limits a major life activity. Lowell has not argued that his leg limits his employability, or any other major life activity. He testified that he would not be having any more surgery. He also testified that he didn't allow his problem with his leg to interfere with the performance of his job. Lowell Dep. at 13, 64 (paper 19, att. 1).

■ In order for a plaintiff to show that his ability to work is substantially limited, his condition must generally foreclose the type of employment at issue. *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 724 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). *See also, Wernick v. Fed. Reserve Bank*, 91 F.3d 379 (2d Cir. 1996) (inability to perform a single, particular job is not substantial limitation in major life activity of working); *Redlich v. Albany Law Sch.*, 899 F.Supp. 100, 107 (N.D.N.Y.1995) (stroke victim left physically impaired did not demonstrate significant restriction in ability to perform class of job). Lowell has presented no evidence that his employability in the field of chemical services is currently limited, or was limited at the time he was discharged.

Between October, 1990 and April, 1994, when he was forced at times to miss significant periods of work, Lowell's ability to work was undeniably limited, however. The issue is whether the limitation was substantial.

The regulations implementing the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12102 (1995), set forth three factors to be considered in determining whether an individual is substantially limited in a major life activity: 1) the nature and severity of the impairment; 2) the duration or expected duration of the impairment; and 3) the permanent or long term impact, or the expected permanent or long term impact of or result-ing from the impairment. 29 C.F.R. § 1630.2(j)(1), (2) (1997).

Temporary impairments have been determined to be substantial limitations when there are permanent or long term impacts, or the impairments are severe. *See, School Board v. Arline*, 480 U.S. 273, 281, 107 S.Ct. 1123, 1127–28, 94 L.Ed.2d 307 (1987) (tuberculosis which required hospitalization in the past would establish substantial limitation); *Potvin v. Champlain Cable Corp.*, 687 A.2d 95, 98–99 (Vt.1996) (impairment lasting five months and requiring three surgeries could be covered by FEPA). Strictly temporary impairments without lasting ill effects are not considered substantially limiting. *Id.; McDonald v. Pennsylvania Dep't. of Pub. Welfare*, 62 F.3d 92, 95 (3d Cir.1995) (citing 29 C.F.R. pt. 1630 app.).

Lowell's impairment is long-term, but the impact of that impairment on his ability to work was strictly temporary. Under similar circumstances, the Fifth Circuit Court of Appeals held that an individual was not handicapped within the meaning of the Rehabilitation Act.[2] In *Evans v. City of Dallas*, 861 F.2d 846, 852–53 (5th Cir.1988), a former employee brought suit for discrimination under the Act, alleging his discharge for excessive absenteeism resulted from a knee injury which required surgery. Because the injury did not continue to limit any major life activities, it did not bring him within the scope of the Act.

Although Lowell's ability to work was substantially limited at various times in the period between October, 1990 and April, 1994, his injury has not impaired his ability to work at any time thereafter. He has failed to establish that 'he is a handicapped individual, for FEPA purposes, because he has not shown that he has a physical impairment which substantially limits a major life activity. *See also Bolton v. Scrivner, Inc.*, 36 F.3d 939 (10th Cir.1994) (permanent partial disability in both feet, restricting ability to stand, walk or lift, did not establish substantial limitation on ability to work), *cert. denied,* —— U.S.

---

**2.** The Rehabilitation Act of 1973 prohibits discrimination against otherwise qualified individuals with handicaps by any program or activity which receives federal financial assistance. 29 U.S.C. § 794(a) (Supp.1996). The language defining an individual with a handicap is identical to FEPA's language. 29 U.S.C. § 706(8)(B) (Supp.1996).

——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

Because Lowell has not shown that he is a handicapped individual, he has not established that he comes under the protection of FEPA. *See Hodgdon,* 160 Vt. at 162, 624 A.2d 1122 (first issue in any FEPA handicap-discrimination claim is whether plaintiff is handicapped individual, and thus within protection of Act). Accordingly, his FEPA claim must be dismissed.

### B. Retaliatory Discrimination

Title 21, section 710(b) of the Vermont Statutes provides that "No person shall discharge or discriminate against an employee from employment because such employee asserted a claim for [workers' compensation] benefits under this chapter or under the law of any state or under the United States." Vt.Stat.Ann. tit. 21, § 710(b) (1987). Lowell claims in Counts II and III that he was laid off in retaliation for pursuing workers' compensation remedies in violation of this statute.

■ To withstand summary judgment on a claim that an employee was discriminated against for filing a workers' compensation claim, he must present a prima facie case of retaliatory discrimination, consisting of four elements: "(1) he was engaged in a protected activity, (2) his employer was aware of that activity, (3) he suffered adverse employment decisions, and (4) there was a causal connection between the protected activity and the adverse employment decision." *Murray v. St. Michael's College,* 164 Vt. 205, 667 A.2d 294, 299 (1995) (citing *Gallipo v. City of Rutland,* 163 Vt. 83, 656 A.2d 635, 640, 642 (Vt.1994)). If the plaintiff succeeds in establishing a prima facie case of retaliato-

ry discrimination, the defendant must come forward with a legitimate, nondiscriminatory reason for the conduct at issue. If the defendant articulates such a reason, then the plaintiff will be required to show that the reason was a pretext for discrimination. *Id.*

■ The parties do not dispute that filing a workers' compensation claim is protected activity, that IBM was aware that Lowell had made such a claim, and that Lowell suffered an adverse employment decision. They differ as to whether there was a causal connection between Lowell's seeking workers' compensation for his knee injury and the elimination of his job.[3]

Lowell has presented several factors which he claims establish the requisite causal connection: the timing of adverse employment actions relative to the filing of his workers' compensation claim; comments made by a manager regarding his injury-related absence from work; lower performance evaluations following his absence from work; speculation that his absences might have been responsible for his failure to secure another position in the company; and manipulation of the layoff protocol to eliminate Lowell's position. As discussed below, individually and collectively these factors fail to establish this essential element of his claim.

#### 1. Timing

■ Timing alone may establish a causal connection between protected activity and an adverse employment decision, for purposes of surviving a summary judgment motion. *Murray,* 667 A.2d at 300. Lowell's injury occurred in July, 1990. IBM's first report of injury was submitted to the Vermont Department of Labor and Industry shortly thereafter. He received temporary total disability

---

**3.** Although the only adverse action mentioned in Lowell's complaint was his discharge from employment, Lowell argues in his opposition to summary judgment that, before being laid off, he suffered additional adverse employment decisions. Specifically, he argues that he was given unfairly low job evaluations, that he was subjected to negative comments about his absences from work, and that he was not hired for another position within the company. For purposes of this opinion, the Court will assume that low performance evaluations and failure to transfer are adverse employment actions. *See Sergio de*

*la Cruz v. New York City Human Resources Admin. Dept.,* 82 F.3d 16, 21 (2d Cir.1996) (transfer to another unit is legally cognizable adverse action); *Medwid v. Baker,* 752 F.Supp. 125, 137 (S.D.N.Y.1990) (poor evaluation is adverse action); *but see Johnson v. Frank,* 828 F.Supp. 1143, 1153 (S.D.N.Y.1993) (poor midyear evaluation is not adverse action). A manager's negative comments simply do not constitute an adverse employment decision. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996).

payments at various times over the next four years. In October, 1994 he was approved for a lump sum permanent partial disability payment. On December 6, 1994, Lowell was notified that he was being laid off.

Lowell was laid off more than four years after he sustained his knee injury. The timing between injury and layoff does not suggest a causal connection. *See e.g., Roger v. Yellow Freight Systs. Inc.*, 21 F.3d 146 (7th Cir.1994) (employee laid off 18 months after sustaining injury could not rely on timing); *Miller v. CertainTeed Corp.*, 971 F.2d 167 (8th Cir.1992) (timing not suspicious where injury occurred four years before employee's position was eliminated); *Oliver v. Digital Equip. Corp.*, 846 F.2d 103 (1st Cir.1988) (33 month interval would not support retaliatory motive).

■■■ In a supplemental memorandum, Lowell offered an additional timing argument, that he was laid off in retaliation for having received a substantial permanent partial disability award approximately one month before IBM began the process of determining who would be discharged. Lowell, however, has offered no evidence that anyone involved with his termination had any knowledge that he had been approved for or received a substantial disability award. Although the Vermont Supreme Court in *Murray* held that timing alone will supply a causal connection between protected activity and adverse employment decisions, 667 A.2d at 299, that ruling was made in a case in which knowledge of the protected activity was conceded. IBM has not conceded that the individuals who decided to lay Lowell off knew anything about his award. If the protected activity is alleged to be the award, and not the claim generally, then timing alone cannot establish the causal connection, without some indication that those responsible for the termination knew about the award. *See Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 769 (7th Cir.1994) (JNOV appropriate where plaintiff failed to establish that those responsible for termination had any knowledge of workers' compensation claim);

*Rouse v. Farmers State Bank*, 866 F.Supp. 1191, 1205 (N.D.Iowa 1994) (in cases where timing alone was sufficient to establish causal connection, defendant's knowledge was not at issue).

2. Other evidence of causal connection

As additional evidence of retaliation, Lowell pointed to remarks made by his second level manager, Donald Sargent, on more than one occasion, commenting sarcastically on his return to work after extended absences caused by the knee injury. Lowell has not shown a connection between the comments and any adverse employment decision. The comments were evidently made some time before the spring of 1994.[4] They do not themselves suggest that management was upset with Lowell for filing a workers' compensation claim, or receiving an award. Furthermore, no evidence has been presented that Sargent had any power over the decision to lay Lowell off, or influenced it in any way.

During the spring of 1994, Lowell applied for a job outside his department but within IBM. After he failed to obtain the position, he talked to an individual in the personnel department, who speculated that Lowell's injury and the time missed from work might have been a consideration. This comment, from someone who was not involved in any of the adverse employment decisions affecting Lowell, more than three years after Lowell was injured, does not suggest a causal connection between Lowell's workers' compensation claim and those decisions.

Lowell dropped from an overall performance evaluation rating of "2" in April, 1991 to "3" in July, 1992. His manager commented in the evaluation that he had delayed Lowell's annual review until July because he had been out for three months due to an operation (paper 21, att. 8). His 1993 evaluation was also delayed because Lowell was out on medical leave. Cootey Dep. at 85 (paper 21, att. 12). In his next evaluation, in April 1994, Lowell again received a rating of "3." Management attributed Lowell's failure to meet the objectives of one of his work assign-

4. Lowell applied for a job in another department of IBM in the spring of 1994. He felt at the time that Sargent was trying to get rid of him, because of the manager's negative comments about lost time from work.

ments in part to his absence from work on sick leave (paper 21, att. 9).

These lowered performance evaluations took place 24 months and 45 months after the knee injury. There is no evidence that management lowered Lowell's performance evaluations in retaliation for his having filed a workers' compensation claim, or having received an award of benefits, and the timing of the events does not suggest a connection. Furthermore, the lower performance evaluations themselves do not suggest that IBM was upset with Lowell for filing or pursuing a workers' compensation claim, as opposed to being upset with him for missing time from work.

Finally, Lowell argues that the criteria for determining who would be selected for layoff were manipulated to result in his being selected. In early fall 1994, Lowell's supervisor, George Cootey, was informed that there would be a layoff. He was told to review the job levels within his department and determine if there was a "surplus" within any of the levels. If there was a surplus at any level, then he was to take into account job performance and seniority to determine who would be declared excess. This procedure was to be followed in all departments by all managers in IBM's Microelectronics Division. Grose Memo (paper 19, att. 4); MDRP Training Program (paper 21, att. 11); Cootey Dep. at 58–61 (paper 21, att. 12).

Cootey concluded that he had a surplus at level 19, Lowell's level. Cootey had reorganized the department earlier in the year, while Lowell was on medical leave, essentially eliminating Lowell's team leader position. He assigned Lowell to other duties. Once Cootey established that he had a surplus, he looked at a weighted average of the last three job performance appraisals. Seniority was to be a tie-breaker. Cootey Dep. at 64–68, 73, 77.

There were four employees in Cootey's department at level 19. Lowell had the lowest average job performance score. He also had the least seniority. Cootey Dep. Ex. 1 (paper 21, att. 10). Cootey informed Lowell that he was selected to be laid off. Lowell was the only employee in his department selected.

Assuming that management did manipulate the process so that Lowell would be selected, or that Lowell's lower performance ratings were the result of his absences from work, or that Cootey eliminated Lowell's job because he was absent from work so much, Lowell has not made the essential connection between those actions and his protected activity of pursuing his workers' compensation rights. At most, Lowell has shown a link between his lengthy injury-related absences and the adverse employment decisions, but the protected activity at issue here is not use of medical leave, but filing a workers' compensation claim.[5]

In fact, Lowell testified that he felt that he was being punished for missing so much time from work, and not for having pursued a workers' compensation claim.

> Q ... What I'm not following is why that makes you think that you were laid off because of your Workers' Compensation claim.
>
> A It all pretty much falls together. I know that IBM does not lay off people or

---

**5.** The Supreme Court of Kansas has recognized a public policy exception to the employment-at-will doctrine which prohibits discharging an employee for absences due to work-related injuries. *Coleman v. Safeway Stores, Inc.*, 242 Kan. 804, 752 P.2d 645, 652 (1988) (allowing employer to discharge employee for being absent as the result of a work-related injury would allow employer to indirectly fire employee for filing workers' compensation claim, contrary to public policy of state). *See also Ramirez v. IBP, Inc.*, 913 F.Supp. 1421 (D.Kan.1995). Although Vermont has recognized a clear and compelling public policy against retaliatory discharge for filing a workers' compensation claim, *see Murray*, 667 A.2d at 298, it has not taken the additional step of find-

ing a public policy against retaliation for work-related injuries. *See Jones v. Keogh*, 137 Vt. 562, 564, 409 A.2d 581 (1979) (bad faith, malice or retaliation alone no basis on which to find clear and compelling public policy). As Lowell has not argued for such an expansion, this Court will not make the leap of its own accord. *See also Sargent v. Columbia Forest Prod. Inc.*, No. 2:93–cv–116, 1994 WL 902818 at *5 (D.Vt. Jan. 20, 1994) (employer's practice of counting sick days as unexcused absences, however distasteful, did not violate public policy), *aff'd*, 52 F.3d 311 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 256, 133 L.Ed.2d 181 (1995), *mandate recalled and modified*, 75 F.3d 86 (2d Cir.1996).

let them go if they have any claims against them. It seems like a settlement was made to me, and after the settlement was made to me, I was given other tasks doing other things, like people were taking over my position. They'd give me other things to do in a lot of areas, that nobody else really liked to do them, harder areas. Asked me to do level jobs that were not in my level, which I had performed and did them.

Q And you say that the assignment of those tasks was because you had filed a Workers' Comp claim or because you'd received the award?

A I would say no. I cannot exactly say it was because I received the award. I believe it was because I missed so much time from the accident.

Q Was it then to punish you for missing the time?

A I believe—you could call it a punishment, yes.

Lowell Dep. at 17–18 (paper 21, att. 5).

Because Lowell has failed to establish the causal connection element of a prima facie case of retaliatory discrimination, summary judgment is granted on counts II and III.

### C. Breach of Duty of Good Faith and Fair Dealing

 In Count IV, Lowell alleged that, in discharging him, IBM violated a "duty of good faith and fair dealing in the employment relation." Complaint, ¶ 23. He argued, in his opposition to summary judgment, that IBM violated this covenant in firing him "due to his workers' compensation claim, his time missed from work, and his handicap." Memorandum in Opposition at 20.

In *Ross v. Times Mirror Inc.*, 164 Vt. 13, 665 A.2d 580, 586 (1995), the Vermont Supreme Court declined to recognize an implied covenant of good faith and fair dealing "where the employment relationship is unmodified and at-will and the employee is challenging the dismissal based on a right to tenure." Lowell argued that IBM's employee handbook modified the at-will employment relationship because it stated that the company has a tradition of full employment,

"through good times and bad." (paper 21, att. 16). The handbook also gave a list of reasons for termination of employment, including, but not limited to, failure to meet IBM's performance, punctuality or attendance standards, engaging in misconduct or violating a company policy.

Assuming that Lowell's at-will employment relationship was modified, and assuming that he was discharged because of "time missed from work," failure to meet attendance standards is a legitimate ground for termination, according to the employee handbook. Lowell has not presented any evidence that IBM breached a contract of employment with him, much less that it acted in bad faith when it did.

The remaining two grounds for finding a violation of a covenant of good faith and fair dealing, firing him because of his disability or his workers' compensation claim, replicate the claims made in Counts I through III. For the reasons discussed above, these counts are dismissed. If Lowell's claims of discrimination on the basis of handicap or workers' compensation claim cannot withstand summary judgment, there is no basis for concluding that IBM violated a covenant of good faith and fair dealing as a result of the same conduct.

### III. CONCLUSION

It is entirely possible, on the facts asserted to this Court, that IBM, in its decision to lay off Donald Lowell, unfairly took into consideration his lengthy absences from work, absences occasioned by the injury he sustained on IBM's behalf. However unfair the layoff may seem, on the facts and legal theories asserted to this Court, it is not *illegal*. Plaintiff has not sustained his burden of showing that he has evidence sufficient to establish the essential elements of claims of discrimination in violation of FEPA, or retaliation for pursuing a workers' compensation claim, or violation of a covenant of good faith and fair dealing. Defendant's Motion for Summary Judgment (paper 18) is hereby GRANTED.