Alden WARD, Petitioner,

v.

Samuel SKINNER, in his Official Capacity as Acting Secretary of the United States Department of Transportation.

No. 90–2141.

United States Court of Appeals, First Circuit.

Heard June 3, 1991.

Decided Sept. 6, 1991.

Harold L. Lichten, with whom Deborah Piltch and Jane K. Alper, Disability Law Center, Inc., and Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, Mass., were on brief, for petitioner.

\* Of the District of Rhode Island, sitting by desig-

Steven M. Colloton, Sp. Asst., Office of Legal Counsel, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., and Robert V. Zener, Atty., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., were on brief, for respondent.

Before BREYER, Chief Judge, SELYA, Circuit Judge, and PETTINE,\* Senior District Judge.

BREYER, Chief Judge.

Alden Ward, a truck driver with a history of epilepsy, takes anticonvulsant drugs and has had no seizures for seven years. The Secretary of Transportation nonetheless has denied Ward's request to waive a Department of Transportation (DOT) safety rule that disqualifies those with a history of epilepsy from driving trucks in interstate commerce. *See* 49 U.S.C. app. § 2505(a)(3) (authorizing Secretary to issue safety regulations); 49 C.F.R. § 391.-41(b)(8) (regulations prohibiting anyone with an "established medical history or clinical diagnosis of epilepsy" from driving commercial vehicles in interstate commerce); 49 U.S.C. app. § 2505(f) (authorizing waiver of DOT safety regulations). Mr. Ward now appeals DOT's waiver denial. He claims that it violates Section 504 of the federal Rehabilitation Act, which says

> No otherwise qualified individual with handicaps, ... shall by reason of her or his handicap, be .... subjected to discrimination ... under any program or activity conducted by any Executive agency....

29 U.S.C. § 794. In our view, the denial of a waiver does not violate the Act. We therefore affirm the Secretary's determination.

I

*Background*

We can state the relevant legal, factual, and procedural background concisely. Since 1935 federal statutes have authorized the Secretary of Transportation to issue, and to enforce, regulations governing commercial motor vehicle safety. *See*

nation.

§§ 204(a)(1) and (2) of the Motor Carrier Act of 1935, 49 Stat. 543, 546 (1935) (current version at 49 U.S.C. app. § 2505(a)). A regulation, first issued pursuant to this statutory authority in 1939, now says that a

> A person is physically qualified to drive a motor vehicle if that person ... [h]as no established medical history or clinical diagnosis of epilepsy....

49 C.F.R. § 391.41(b)(8). *See* 4 Fed.Reg. 2294, 2295–96 (1939) (§§ 1.21(b), 1.31). A Department explanation of the section, which has appeared in the Federal Register from time to time since 1977, says that

> It is the intent [of this section] to permanently disqualify a driver who has a medical history or clinical diagnosis of epilepsy.

42 Fed.Reg. 60082 (1977).

The petitioner, Alden Ward, has a history of epileptic seizures. Anticonvulsant medicine, however, has kept those seizures under control; he has had no seizures at all since 1984; and, he worked without incident as a truck driver until May 1989. At that time Ward's employer discovered his epileptic history and suspended him from his job, as DOT's regulation requires.

Mr. Ward then asked DOT to waive application of its regulation in his case. He pointed out that DOT's Secretary has the legal power to

> waive ... application of any regulation ... if the Secretary determines that such waiver is not contrary to the public interest and is consistent with the safe operation of commercial motor vehicles.

49 U.S.C. app. § 2505(f). He submitted medical information showing that his convulsions had last occurred nearly six years earlier, that even then they were infrequent and nocturnal, and that anticonvulsant medicines effectively controlled them. He submitted a statement from his doctor to the effect that he should be permitted to drive a truck. And, he submitted a statement from Dr. Allan Krumholz, a nationally recognized expert on epilepsy who had served on a 1988 DOT medical "regulation-reevaluating" task force. Dr. Krumholz also said, in effect, that DOT should permit

Ward to drive, and he added that, in his view, "the exclusion of individuals who are taking anti-epileptic or anticonvulsant medications from commercial driving is also wrong."

DOT initially pointed out that it currently was revising its "epilepsy-related" rules in light of the 1988 Task Force's recommendations, and it suggested that Ward simply participate in that rule-making proceeding. Ward noted, however, that rule-making and rule-revising can take a long time and that he needed his truck-driving job, so he asked DOT to rule on his waiver request. DOT then pointed (1) to the conceded fact that he was taking anti-convulsant medicine, (2) to the 1988 Task Force's recommendation *against* permitting those taking seizure-control medicine to drive, and (3) to the basic "anti-epileptic" regulation. It denied the waiver request. Ward appeals that denial. He says that DOT failed to give his case the "individualized consideration" that the Rehabilitation Act requires, *see* 29 U.S.C. § 794; *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), and that, had it done so, it would have found him to be a safe driver and waived the "anti-epileptic" rule.

II

*Reviewability*

■ The Government initially argues that we cannot review the legality of the Department's decision to deny Ward a waiver. The Government concedes that courts may review the legality of almost any final agency action that adversely affects a private citizen. 5 U.S.C. § 702; *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–12, 18 L.Ed.2d 681 (1967). But, it points out that the Administrative Procedure Act contains an exception to the "reviewability" norm where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). It notes that the Supreme Court has said in several cases that a particular kind of agency action may fall within the scope of this exception if there is "no law to apply." *Webster v. Doe*, 486 U.S. 592, 599–600, 108

S.Ct. 2047, 2051–52, 100 L.Ed.2d 632 (1988); *Heckler v. Chaney,* 470 U.S. 821, 835, 105 S.Ct. 1649, 1657, 84 L.Ed.2d 714 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). It adds that the waiver statute permits, but does not require, the Secretary to waive any regulation

> if the Secretary determines that such waiver is not contrary to the public interest and is consistent with the safe operation of motor vehicles.

49 U.S.C. app. § 2505(f). It concludes that this discretionary authority is so broad, that, in effect, a reviewing court has "no law to apply." Hence, a waiver decision falls within the "committed to agency discretion" exception, and the law forbids review.

The short, nearly conclusive, answer to this claim, however, is that there is "law to apply." Mr. Ward says that the Department's refusal to grant him a waiver violates the Rehabilitation Act, an Act that applies to the Department's decisions, including decisions not to grant a waiver, *see Cousins v. Secretary of the United States Dept. of Transportation,* 880 F.2d 603, 609 (1st Cir.1989) (en banc), and which the Supreme Court has frequently interpreted. The Department's written opinions make clear that it denied the waiver because of Ward's epileptic condition. The legal issue is simply whether the denial of a waiver for this reason violated the Act.

Although the Department's broad "waiver" powers might mean that a private citizen, denied a waiver, would find it very difficult to show illegality based on the legal theory of "abuse of discretion," 5 U.S.C. § 706(2)(A), the breadth of that power does not limit our practical ability to review this particular Rehabilitation Act issue. We can decide the Rehabilitation Act question in the "waiver" context as easily as in most other contexts. And, as far as we can tell, our doing so does not impose upon the agency an unusually heavy burden (*i.e.,* a burden significantly heavier than the burden that judicial review imposes in other contexts). *Cf., e.g.,*

*Heckler v. Chaney,* 470 U.S. at 835, 105 S.Ct. at 1657 (no review of Federal Food and Drug Commissioner's decision whether or not to "conduct examinations and investigations"). We can find no reason why a broad waiver power that might make it difficult for a private citizen to show an "abuse of discretion," or for a court to review such a claim, would prevent us from reviewing *other* claims of illegality—such as a claim that the Department's refusal to grant a waiver, say, rested on unconstitutional racial discrimination, or violated a specific provision of the Motor Vehicle Safety Act or, as here, violated the Rehabilitation Act.

The Supreme Court has sometimes used language that (out of context) might suggest that broad statutory authority, leaving the courts without "law to apply," could deprive the court of power to review other claims as well. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 410, 91 S.Ct. at 820 (Marshall, J.); *but cf. Heckler v. Chaney,* 470 U.S. at 850–54, 105 S.Ct. at 1665–68 (Marshall, J., dissenting) (making clear that courts can review constitutional and similar questions). But, the Supreme Court, to our knowledge, has only under very special circumstances held that a court lacks the power to review a claim that an agency action violates a specific statute or the Constitution. Where, for example, the very act of judicial review risks an impermissible interference with the exercise of a power—say, the foreign affairs power—for which the Constitution makes the Executive Branch of government primarily responsible, the Court has found the agency action "committed to agency discretion." *See, e.g., Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948) (refusing to review Civil Aeronautics Board award of an overseas air route which the President had approved, noting that "the very nature of executive decisions as to foreign policy is political, not judicial"). *Cf. Webster v. Doe,* 486 U.S. at 606–09, 108 S.Ct. at 2055–57 (Scalia, J., dissenting) (determining whether a decision is "committed to agency discretion by law ... requires

evaluation of such factors as whether the decision involves a sensitive and inherently discretionary judgment call, ... is the sort that has traditionally been nonreviewable, ... and whether review would have disruptive practical consequences") (internal quotations and citations omitted). In other circumstances, practical considerations of an agency's administrative needs, a broadly worded statute, and experience drawn from tradition may combine to suggest that routine court review of certain kinds of agency decision-making—such as agency enforcement decisions—threatens to impose unwarranted burdens on both court and agency, and that, consequently, such decisions are normally "committed to agency discretion by law." *Heckler v. Chaney,* 470 U.S. at 835, 105 S.Ct. at 1657; *see also Hahn v. Gottlieb,* 430 F.2d 1243, 1249 (1st Cir.1970) (refusing to review Federal Housing Agency determination since "courts are ill-equipped to superintend economic and managerial decisions of the kind involved here"). None of these special circumstances is present here, however. Consequently, we can find no reason for departing from this circuit's precedent. *See Cousins v. Secretary of the United States Dept. of Transportation,* 880 F.2d at 609; *NAACP v. Secretary of Housing and Urban Dev.,* 817 F.2d 149, 157–59 (1st Cir. 1987). And, we conclude that Ward's claim is reviewable.

## III

### *The Rehabilitation Act*

■ Mr. Ward's basic claim is that DOT, in denying him a waiver, violated the Rehabilitation Act—an Act that makes it unlawful for DOT to forbid him from driving trucks "by reason of ... his handicap," *i.e.,* his epilepsy, if he is "otherwise qualified" to drive. (We suspect that, in this context, we should read the word "otherwise" to mean "nonetheless," for "otherwise," in its ordinary sense, means "without the handicap" in which case virtually every handicapped person would be "otherwise qualified.") He points out that in *Arline,* 480 U.S. at 287, 107 S.Ct. at 1130, the Supreme Court held that the Rehabilitation Act re-

quires that "in most cases, the district court conduct an individualized inquiry and make appropriate findings of fact" to determine if an individual is "otherwise" (or "nonetheless") qualified for the job. Ward says that DOT did not make a sufficiently individualized inquiry in his case; and, had it done so, it would have found that he can safely drive.

Of course, DOT did "individualize" its inquiry to some extent. It did not simply rely upon its absolute "anti-epilepsy" rule. It noted that a recent 1988 DOT medical task force had recommended that those with epilepsy be permitted to drive if they had had no seizures *and* had not taken anticonvulsant drugs for ten years. DOT asked Ward to submit

> complete copies of [his] ... medical records related to the diagnosis and treatment of his epilepsy, and a copy of his complete driving record....

DOT concluded from this information that Ward had been seizure-free for six years, but that he took anticonvulsant drugs. Noting that the Task Force recommended against an exception in such circumstances, it denied the waiver. The question before us is whether DOT could rely upon the general statement embodied in the Task Force conclusion, or whether the Act required it to make a more detailed and individualized inquiry into Ward's particular circumstances, in effect deciding whether it might be safe to permit driving by at least some epileptics who are seizure-free but use anticonvulsant drugs.

In our view, the Supreme Court's post-*Arline* case, *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), makes clear that the answer to this question is "no." The issue before the Supreme Court in *Traynor* resembles the issue before us. A statute granted physically or mentally disabled veterans an extension of time to apply for certain veterans' benefits unless the "physical or mental disability" was "the result of" their own "willful misconduct." 38 U.S.C. § 1662(a)(1). The Veterans' Administration (VA) denied the "benefit" of this rule to alcoholics (except where a separate physical or mental illness

caused the alcoholism) on the ground that in all other instances alcoholism was the result of "willful misconduct." *See* 38 C.F.R. § 3.301(c)(2). The petitioners, alcoholics, argued that the VA's alcoholism rule was overly broad, that (in addition to separate physical and mental illness cases) alcoholism did not always reflect "willful misconduct," and that the Rehabilitation Act (as interpreted in *Arline*) required the VA to make an "individualized inquiry" into the plaintiffs' special circumstances. Otherwise, said the plaintiffs, the VA was depriving them of "benefits" (namely, the time extension) because of "handicaps" (namely, their allegedly non-willful alcoholism) although they were nonetheless "qualified" for the "benefit" (because their alcoholism handicaps were not caused by "willful misconduct").

The Supreme Court, in *Traynor*, rejected the petitioners' argument

that § 504 mandates an individualized determination of 'willfulness' with respect to each veteran who claims to have been disabled by alcoholism.

485 U.S. at 550, 108 S.Ct. at 1383. It said that § 504

does not demand inquiry into whether factors other than mental illness rendered an individual veteran's drinking so entirely beyond his control as to negate any degree of 'willfulness' where Congress and the Veterans' Administration have reasonably determined for purposes of the veterans' benefits statutes that no such factors exist.

*Id.* at 551, 108 S.Ct. at 1383. And, in a footnote, it offered a practical reason in support of its holding, namely that an "individualized inquiry"

would saddle the Government with additional administrative and financial burdens that Congress could not have contemplated in extending § 504 to federal programs.

*Id.* at 551 n. 12, 108 S.Ct. at 1383 n. 12. As we read this language, in its context, we believe the case holds that an agency, in treating handicapped persons, may sometimes proceed by way of general rule or principle, at least where 1) the agency behaves reasonably in doing so, 2) a more individualized inquiry would impose significant additional burdens upon the agency, and 3) Congress, as well as the agency, has expressed some kind of approval of the general rules or principles concerned.

*Arline*, in stating that in "most cases" there should be an "individualized inquiry," 480 U.S. at 287, 107 S.Ct. at 1130, does not necessarily hold the contrary. The Court there was speaking of district court proceedings, not agency rules, practices and regulations addressed specifically to the handicapped problem. And, the Court there spoke of "most"—not "all"—cases. We doubt that the Court's holding in *Arline*, even standing alone, would mean that the Department could not adopt reasonable rules concerning the relationship between certain handicaps, say poor vision, and certain activities like driving. But, whether or not *Traynor* represents a change in the law, it is *Traynor*, not *Arline*, that governs the case before us.

For one thing, the petitioner here, as in *Traynor*, seeks an "individualized inquiry" that would permit him to escape the application of a general agency rule that would otherwise act as a handicap-based disqualification. In a sense, this case, like *Traynor*, involves distinctions *among* different categories of handicapped persons, distinctions which, in petitioner's view, will remove a subcategory of such handicapped persons from a more general category that penalizes him. For another thing, the burden of individualizing DOT's "waiver application" inquiries, beyond what the agency has done already, would seem significant. The parties seem to disagree, not about any individual facts concerning petitioner's health, but about whether the Task Force's recommendation to disqualify those who, like petitioner, take anticonvulsant medicine, is a sound recommendation—a matter more fit for a rule-making, than for a rule-waiver, proceeding (see page 164, *infra*).

Further, as in *Traynor*, Congress has enacted legislation that suggests some degree of awareness of, involvement in, or approval of the relevant regulation. In

*Traynor*, the Court found approval in the fact that Congress, enacting the "willfulness" language *before* it enacted the Rehabilitation Act, referred in legislative history to the VA's longstanding rules interpreting that word as excluding most alcoholism. *See Traynor*, 485 U.S. at 546, 108 S.Ct. at 1380, *citing* S.Rep. No. 468, 95th Cong. 1st Sess. at 69–70 (1977), 1977 U.S.Code Cong. & Admin.News, 3747. The Court considered itself legally obliged to try to read the Rehabilitation Act as consistent with this earlier Congressional understanding. *Traynor*, 485 U.S. at 548, 108 S.Ct. at 1381. Here, Congress enacted the transportation safety statute *after* it passed legislation applying the Rehabilitation Act to all federal programs. And, in doing so, it, in effect, repromulgated longstanding agency regulations, such as the epilepsy regulation. It said specifically that commercial vehicle safety regulations "which the Secretary issued before October 30, 1984, . . . shall, for purposes of this chapter, be deemed to be regulations issued by the Secretary under this section." 49 U.S.C. app. § 2505(e).

We must concede that, in this last-mentioned respect (the degree of congressional consideration), we see potential distinctions between this case and *Traynor*. We do not know that Congress, in 1984, actually thought about the epilepsy regulation or its relation to unwarranted discrimination (although it also seems unlikely that anyone in Congress thought about this matter in respect to alcoholism in 1979 when Congress enacted the Rehabilitation Act). In any event, as we said, we doubt that the Act (even as interpreted in *Arline*) requires individual inquiry to the point where doing so is unreasonably burdensome (taking account not only of administrative needs but also of Rehabilitation Act policies). Our doubt, plus the strong similarity between this case and *Traynor*, leads us to apply here the legal standard that *Traynor* suggests. We therefore ask whether DOT's reliance upon a general Task Force recommendation (to deny a waiver to those with epilepsy who must take anti-seizure medicine) was reasonable in light of both the administrative difficulties of further inquiry in the waiver context and the antidis-criminatory policies embodied in the Rehabilitation Act.

After examining the record, we conclude that DOT's refusal, without making further "individualized inquiry," to grant a waiver was reasonable for the following reasons. First, DOT did inquire into some of Mr. Ward's individual characteristics. It determined that, although he had a history of epilepsy, he had not had a seizure for many years, but that he controlled his seizures through the use of anticonvulsant medicine.

Second, DOT relied upon a narrow version of its historic anti-epilepsy rule. It referred to its 1988 Task Force Report. That Report, unlike the pre-existing rule, would permit a narrow class of those with a history of epilepsy to drive commercial vehicles, namely those individuals without seizures for ten years who do not use drugs to control the seizures. That Task Force Report also concluded, however, that individuals with "Diagnosed Epilepsy Taking Anticonvulsant Medications with Seizures Controlled" should "not be authorized to drive commercial interstate vehicles."

Third, the Task Force Report's conclusion itself seems a reasonable one. The question about whether seizure-free epileptics taking anticonvulsant medicine should be authorized to drive commercial vehicles is obviously a close one. The Task Force Report itself points out that the risks of seizure or accident are extraordinarily low. It says that the risk of such an individual having an epileptic seizure while driving is "possibly at or even below baseline rates," *i.e.*, *less* than the risk that a person who has *never had* epilepsy will suddenly have a seizure while at the wheel. (This latter risk itself is very low: in any given year about 50 out of 10,000 white males will have a heart attack; about five out of 10,000 white males will have an epileptic seizure.) Yet, the Report goes on to say that the risk may be somewhat higher for truck drivers who keep odd hours or eat irregularly. And, it adds that the risk is low only if the individual actually takes his medicine; he may forget. The Report, af-

ter describing the very low risk, reasons as follows:

> Nonetheless, these individuals are exposed to conditions previously discussed [i.e., irregular sleeping and eating conditions] which in and of themselves increase the risk for seizures in seizure-prone individuals. In addition, the inconsistent access to medical care may cause difficulty in the evaluation of acute problems which may increase the risk for seizure occurrence, and the acquisition of replacement anticonvulsant medication if drugs are lost or forgotten, place such individuals at some increase in risk. These individuals should not be authorized to drive commercial interstate vehicles. It is impossible to predict which of these individuals may have seizures should they inadvertently miss a dosage of medication. However, this issue requires further investigation and should be reassessed in the future when more data is collected.

The record does not permit us to conclude that this argument is an unreasonable one.

Fourth, the Task Force's position also suggests that further "individualized" investigation of Mr. Ward's individual case is most unlikely to provide reasons for believing he can drive commercial trucks safely; rather, further general studies and investigations, designed to turn up general features tending to show greater, or lesser, degrees of risk, are what the Task Force seems to think are required.

Fifth, DOT says that it "plans to initiate a further review of the epilepsy rule based on the ... conference report." DOT added that it would place the materials that Mr. Ward submitted, including the letter from Dr. Krumholz (who served on the Task Force), "in the public docket which we are opening on this subject." The nature of the inquiry that the Task Force suggested seems well suited to a general rule-making inquiry, for it likely involves consideration of risk rates, special features of different cases that may change those rates, and possible alternative ways of accommodating those in Mr. Ward's situation. A more thorough examination of Ward's case alone would seem less likely to shed light on the proper way for DOT to deal either with Ward himself or with those who share his circumstances. Of course, a change in the rule may help only those others; it may come too late to help Mr. Ward. But, given the nature of the problem and the Task Force recommendation, DOT's procedural decision, like its substantive decision, is reasonable.

We conclude that DOT could reasonably decide not to investigate Mr. Ward's case further and that it could rely upon the Task Force's general, recommended rule in denying him a waiver from its rule forbidding those with a history of epilepsy to drive commercial vehicles in interstate commerce. Its decision is

*Affirmed.*