USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 
 

No. 98-1420

 DENNIS THERIAULT,

 Plaintiff, Appellant,

 v.

 RICHARD M. FLYNN, COMMISSIONER, 
 NEW HAMPSHIRE DEPARTMENT OF SAFETY,
 
 Defendant, Appellee.
 

 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF NEW HAMPSHIRE
 
 [Hon. Steven J. McAuliffe, U.S. District Judge]
 

 Before
 
 Lipez, Circuit Judge,
 and Coffin and Campbell, Senior Circuit Judges.
 
 

 Wiltrud R. Mott-Smith with whom Ronald K. Lospennato was on
brief for appellant.
 Martha A. Moore, Assistant Attorney General, with whom Philip
T. McLaughlin, Attorney General, was on brief for appellee.

 
 
 December 8, 1998
 
 
 
 
 

 COFFIN, Senior Circuit Judge. Plaintiff-appellant Dennis
Theriault claims that the Commissioner of the New Hampshire
Department of Safety ("the Commissioner") violated the Americans
with Disabilities Act, 42 U.S.C. 12101-12213, by requiring him
to take a road test as a prerequisite to renewing his driver's
license when such testing was not a mandatory part of the renewal
procedure for all applicants. Theriault, who has cerebral palsy
and uses a wheelchair, previously had obtained a license to operate
a vehicle equipped with hand controls. He maintains that he was
required to pass a new test solely because of his disability. The
district court concluded that a licensing officer's decision to
administer the road test, after observing Theriault's apparent
inability to control his hand movements, did not constitute
unlawful discrimination, and granted summary judgment for the
Department. We affirm.
 I. Background
 Our review of a district court's grant of summary
judgment is plenary, see American Airlines v. Cardoza-Rodriguez,
133 F.3d 111, 116 (1st Cir. 1998), and we must consider the facts
in the light most favorable to the opposing party, plaintiff
Theriault. See id. Summary judgment is appropriate only if there
is no genuine issue of material fact, allowing the court to
conclude that the Commissioner is entitled to judgment as a matter
of law. See id.; Fed. R. Civ. P. 56(c). We briefly outline the
relevant facts with these standards in mind.
 Theriault's cerebral palsy, among other symptoms,
diminishes his ability to use his legs and causes involuntary hand
movements. He uses a walker to travel short distances and a manual
wheelchair or electric scooter for longer distances. He originally
obtained a driver's license in 1987 after a road test in which he
used a vehicle equipped with hand controls. Although road tests
are not always part of the renewal process, Theriault was asked to
take a road test again when he first renewed his license in 1991;
he was told that the test was necessary at that time because his
original license had not been properly coded for the use of special
equipment. He successfully completed the test and was issued a
license stamped with the letter "C," which indicated the use of hand
controls. In February 1995, Theriault applied to renew his license
for the second time, triggering the events underlying this case. 
Because his ability to write is extremely limited as a result of
his cerebral palsy, Theriault's father completed the application
form for him. After submitting the form, Theriault was asked to
take a road test again. No explanation was given at that time for
the testing. He again successfully completed the driving
evaluation and was issued the renewal license.
 Theriault subsequently filed this lawsuit and alleged
that requiring a road test "solely on the basis of his obvious
disability, and without any substantiated information that he posed
a particular risk to public safety," constituted discrimination in
violation of the ADA. In response, the Commissioner argued that
the decision to require a road test did not reflect impermissible
discrimination, but resulted instead from the licensing officer's
judgment that Theriault's physical condition on the day he sought
relicensing warranted assurance that he could safely drive a
vehicle. In support of the decision to require the road test, the
Commissioner relied upon a New Hampshire Department of Safety
regulation stating that applicants under age 75 may be required to
take road tests as part of the renewal process
 if the director has any reason to believe the
 applicant may be a hazard to public safety if
 licensed to drive, such as but not limited to
 apparent psychological or physical impairment.

N.H. Code Admin. R. [Saf-C] 1003.27(b). 
 The district court concluded that the Commissioner did
not discriminate against Theriault based on his disability and
therefore did not violate the ADA in requiring Theriault to take a
road test. The court explained its review of the undisputed facts
as follows:
 [I]t is evident that defendant required
 plaintiff to perform a road test, not simply
 because he finds himself among that group of
 persons who suffer from cerebral palsy, but
 based upon his own manifested symptoms and
 apparent inability to control his hand
 movements on the day he sought relicensing,
 and the fact that he operates his automobile
 with hand controls. That is to say, defendant
 asked plaintiff to demonstrate his ability to
 safely operate his motor vehicle because the
 physical manifestations of his disability (at
 least on the day in question) reasonably
 suggested to defendant that, despite his prior
 ability to drive safely, plaintiff may have no
 longer been able to do so.

 After an unsuccessful motion to alter judgment, Theriault
appealed, claiming that the court improperly drew factual
inferences favorable to the Commissioner and misapplied the ADA in
concluding as a matter of law that the road testing did not
constitute unlawful discrimination.
 II. Discussion
 The ADA is a federal civil rights statute designed to
provide comprehensive protection for disabled individuals against
discrimination based on their disabilities. See Arnold v. United
Parcel Serv., 136 F.3d 854, 861 (1st Cir. 1998); Jacques v. Clean-
Up Group, Inc., 96 F.3d 506, 510 (1st Cir. 1996); 42 U.S.C. 
12101(b)(1). Title II of the statute provides that no "qualified
individual with a disability" shall, by reason of that disability,
"be excluded from participation in or be denied the benefits of the
services, programs, or activities of a public entity." 42 U.S.C. 
 12132. The protection afforded by the ADA is characterized as
a guarantee of "meaningful access" to government benefits and
programs, see Alexander v. Choate, 469 U.S. 287, 301 (1985); Wynnev. Tufts Univ. Sch. of Med., 932 F.2d 19, 24 (1st Cir. 1991) (enbanc), which broadly means that public entities must take
reasonable steps to ensure that individuals with disabilities can
take advantage of such public undertakings.
 This aspect of the ADA is not directly at issue here, as
it cannot reasonably be argued that Theriault was denied
"meaningful access" to a government benefit or program. New
Hampshire does not foreclose individuals with cerebral palsy, or
those who use wheelchairs, or even those whose hands uncontrollably
shake, from driving, although their licenses may be restricted to
operating vehicles with appropriate modifications. See N.H. Rev.
Stat. Ann. 263:6, 13. Indeed, Theriault had been a licensed
driver for eight years before the application process at issue, and
his license was renewed, with minimal delay, following the
challenged road test.
 Theriault's claim centers instead on the method used to
determine access to the government benefit, and his contention is
that the extra eligibility requirement imposed upon him -- the road
test -- constituted discrimination based on his disability.
Federal regulations explicitly forbid public entities from
"administer[ing] a licensing or certification program in a manner
that subjects qualified individuals with disabilities to
discrimination on the basis of disability." See 28 C.F.R. 
35.130(b)(6). In the context of licensing or certification, a
person is "qualified" and thus within the protected category if he
or she can meet the "essential eligibility requirements" for
receiving a license or certification, with accommodation made for
the disability. See 42 U.S.C. 12131(2); 28 C.F.R. pt. 35, app. A,
at 472 (1997); Applicants v. Texas State Bd. of Law, 1994 WL
923404, at *6 (W.D. Tex. Oct. 11, 1994).
 In determining whether "essential eligibility
requirements" are met, a public entity properly may consider
whether an applicant with a disability poses a direct threat to the
health and safety of others. See 28 C.F.R. pt. 35, app. A, at 472-
73 (1997); id. at 36.208(c). See also Bragdon v. Abbott, 118 S.
Ct. 2196, 2210 (1998) (involving Title III of the ADA) (noting the
need to balance the interests of individuals with disabilities
against legitimate concerns for public safety); School Board of
Nassau County v. Arline, 480 U.S. 273, 287 (1987) (involving the
Rehabilitation Act) (relied on in Bragdon). According to
regulation, this judgment may not be based on generalizations or
stereotypes about the effects of a particular disability, but must
result from "an individualized assessment, based on reasonable
judgment that relies on current medical evidence or on the best
available objective evidence." 28 C.F.R. 36.208(c); see Arline,
480 U.S. at 287.
 At this juncture, there is no dispute that Theriault,
having demonstrated his ability to drive safely by means of the road
test, meets the "essential eligibility requirements" for obtaining
a New Hampshire driver's license. The issue is whether the
Commissioner violated the ADA in making that determination by
requiring Theriault to take the third road test. Theriault
maintains that his condition had not changed, and perhaps even had
improved, since he previously had renewed his license, and he
emphasizes that he had never had an accident during his eight years
of driving. In Theriault's view, therefore, his eligibility for a
driver's license already had been established, and asking him to
requalify with a road test when nondisabled individuals are not
similarly reviewed constitutes discrimination in the administration
of the driver's license program in violation of the ADA.
 If this were, in fact, a case in which an additional
eligibility requirement had been imposed on an applicant simply
because he is disabled, a violation of the ADA in all likelihood
would have occurred. See Clark v. Virginia Bd. of Bar Examiners,
880 F. Supp. 430, 442 (E.D. Va. 1995) (finding discrimination based
on disability where question on bar application "imposes an
additional burden on applicants with [mental] disabilities to
satisfy additional eligibility criteria"). There is no evidence,
however, that Theriault was singled out simply because he is a
disabled individual or because he has cerebral palsy. The record
reflects, without dispute, that Theriault had limited use of his
hands (so much so that he was unable to complete the application),
and that the license he carried reported that he operated his
vehicle with hand controls. We agree with the district court that
asking him to demonstrate that his present condition did not
interfere with his safe driving ability in other words, asking
him to demonstrate that he remained qualified to drive was not
only permissible but also the state's obligation in balancing the
rights of the disabled with the responsibility to ensure safety on
the roads. 
 Theriault argues that the Commissioner could have and
should have met that obligation in a way that did not have a
disparate impact on individuals with disabilities, either by
administering road tests to all renewal applicants or by soliciting
information from all applicants and their motor vehicle records
about driving history or conditions that might affect their driving. 
The expense of hiring enough licensing officials to conduct the
thousands of tests that would be required to satisfy the first of
these suggestions strikes us as facially unreasonable, and even
Theriault does not press this position. Relying on file information
about driving history, on the other hand, does not speak to an
individual's present ability to drive safely. Moreover, while
requesting information directly from applicants might help identify
additional individuals who should be given road tests, such
interviews would not render road tests irrelevant or improper for
applicants with observable limitations directly relevant to driving
ability.
 In the face of a licensing officer's judgment, based on
direct observation, that an applicant has a condition that could
impact his or her ability to drive safely, we think the Commissioner
may reject reliance on an applicant's statement that the condition
at issue has not changed materially since his or her license
originally was issued or last renewed. Unless invasive probing of
truthfulness were to burden the application process, the results of
self-serving statements would be a shaky basis for license issuance.
Moreover, even assuming candid responses from applicants, such
changes presumably can be small and, while insignificant to the
applicant, properly may prove a basis for concern to an official
whose responsibility extends not only to the applicant before him
but also to all other drivers on the road. The Commissioner cannot
be faulted for erring on the side of caution when safety is at
issue, providing, of course, that the triggering judgment is based
not on stereotypes but on observable, relevant circumstances.
 Theriault does not, in fact, argue that the limitations
in the use of his hands are an inappropriate basis for concern in
a driver who operates a motor vehicle with hand controls. His
argument is that he previously had met this concern. We do not
discount the inconvenience of multiple road tests and take to heart
Theriault's assertion that it is demeaning to be asked repeatedly
to prove his ability to drive. The ADA, however, does not protect
disabled individuals from all differences in treatment stemming from
their disabilities, and it certainly does not require licensing
officials to refrain from evaluating safety risks because an
applicant appears to be disabled. To the contrary, when the safety
of the public at large is implicated, public entities must be
permitted some latitude in their judgments that individualized
assessments of qualifications are necessary. See generally Strathiev. Department of Transp., 716 F.2d 227, 231 (3d Cir. 1983) (program
administrators entitled to "some measure of deference" in
determining reasonableness of a refusal to accommodate an individual
with a disability) (cited in Wynne, 932 F.2d at 25). In our view,
the Commissioner's use of a relatively non-burdensome procedure,
properly based on criteria tailored to the ability to drive safely,
was a lawful method for determining whether Theriault remained a
qualified driver and thus was entitled to a license.
 We recognize that, in so holding, we effectively are
saying that it is not "discrimination" within the meaning of the ADA
to rely on the symptoms or appearance of a disability to single out
a person for an individualized assessment. Although the concurrence
offers a thoughtful differing view, see infra at 22-24, we believe
our approach is consistent with the Supreme Court's ruling in
Arline, 480 U.S. at 273, which rejected a school board's attempt to
justify its discharge of a teacher by claiming that its decision was
based on the contagiousness of her tuberculosis as distinguished
from the disease itself. The school's rationale was found lacking
because there had been no individualized inquiry into the actual
risks of infection posed by the teacher's own illness, and thus no
consideration of whether she was qualified to teach despite her
illness. She was fired simply because she had tuberculosis and
because tuberculosis generally is contagious.
 Thus, what is impermissible under Arline is rejecting an
applicant automatically as a result of his disease or its symptoms,
without considering the individual's abilities. When, however,
symptoms concededly and objectively raise a concern about
qualifications such as significant hand movements in an applicant
for a driver's license who operates his vehicle with hand controls
 the public entity properly may engage in an individualized
inquiry into whether the person is nonetheless qualified without
shouldering the burden of defending its "discrimination" as
"necessary." See 28 C.F.R. 35.130(b)(8). Indeed, we believe this
is why the ADA prohibits discrimination against qualifiedindividuals with disabilities. No cognizable discrimination takes
place when an objectively appropriate qualifying assessment is
required. A different case would be presented, of course, if the
state's criteria for qualification were assertedly discriminatory. 
That is not the case here; the safe-driving standard is accepted as
appropriate.
 Moreover, it is important to note that the triggering
criteria here are not limited to conditions of disability. The
touchstone is observed apparent hazard; the regulation authorizes
further inquiry if there is "any reason" to believe the applicant
may pose a risk to public safety. Although apparent psychological
or physical impairment are specifically listed, the category covers
any condition that might impair one's ability to drive, whether
based on alcohol, drugs, or emotional, physical or other factors. 
This is not a situation in which disabled individuals are singled
out for less favorable treatment based only on the fact that they
are disabled. In our view, the ADA permits a public entity to
consider the symptoms or appearance of a disability at this
threshold stage without activating the burden to defend
discrimination.
 Putting to one side whether our judgment is correct that
no violation of the ADA took place as a matter of law, Theriault
alternatively argues that summary judgment was premature because the
record contained no information about the connection between his
hand movements and the mechanics of the hand controls in his car. 
We reject the suggestion that the licensing official needed to
ascertain the precise way in which Theriault's hand controls worked
or the range of his hand movements before requiring the road test. 
The question faced by the licensing official was whether, given the
apparent physical condition of the applicant before him and the
license restriction, he could safely operate his vehicle. Whether
a road test was a proper method for resolving that concern turns on
those undisputed facts alone. 
 Theriault also suggests that the procedure used here was 
not an "individualized assessment" of his eligibility for a driver's
license, as required by statute, because the details surrounding his
driving record were not examined. In our view, the requirements
were fully met. It was the individual factors of Theriault's
license restriction and the apparent limitations in the use of his
hands not his status as a disabled individual or an individual
with cerebral palsy that made further inquiry into his driving
ability reasonable. The ensuing road test unquestionably was an
individualized assessment of his safe driving skills. Cf., e.g.,
Ward v. Skinner, 943 F.2d 157, 164 (1st Cir. 1991) (upholding denial
of waiver from general rule disqualifying individuals with history
of epilepsy from driving commercial vehicles); Stillwell v. Kansas
City, Mo., Bd. of Police Comm'rs, 872 F. Supp. 682, 683 (W.D. Mo.
1995) (invalidating automatic disqualification of one-handed
applicants for licensing as armed security guards). The fact that
other information about his driving ability could have been
considered does not render the procedures followed inadequate.
 III. Conclusion To sum up briefly, we conclude that the road test
administered to Theriault was a mechanism to determine whether he
remained qualified, not a licensing requirement imposed as a barrier
to his participation in a government program. The record does not
support an inference that Theriault was asked to take the test
simply because he is disabled or suffers from cerebral palsy; his
apparent physical condition on the day of the test presented a
legitimate basis for concern about his ability to safely operate his
motor vehicle. The ADA does not bar such qualifying assessments. 
It is, in fact, a public entity's responsibility first to determine
whether a disabled individual is qualified and then to assure that
such qualified individuals are given meaningful access to public
programs and activities. We believe that, on this record, a
factfinder would have to conclude that the Commissioner fulfilled
these responsibilities.
 We therefore affirm the district court's summary judgment
that the Commissioner did not violate the ADA.
 Affirmed.
 Concurrence follows. LIPEZ, Circuit Judge,(concurring). I agree with the
majority that New Hampshire has a right to require that each driver
licensed by the state meets the essential eligibility requirement
of being able to drive safely. I also agree that there is no
violation of the ADA in the Commissioner's requirement that
Theriault, as part of the license renewal process, perform a road
test in order to establish that he still meets that essential
eligibility requirement. The majority says there is no violation
because requiring Theriault to take a road test to gain the renewal
of his license was not discrimination within the meaning of the ADA. 
I conclude that there was no violation because requiring Theriault
to take a road test, though discriminatory within the meaning of the
ADA, was permissible discrimination under the Act. I believe those
divergent routes reflect important differences in the application
of the ADA, and I therefore write separately.
 I.
 This case involves a challenge to New Hampshire's method
of administering its driver's license renewal program. In my view,
that program discriminates on the basis of disability as the term
"disability" is defined in the ADA: "The term 'disability' means,
with respect to an individual--(A) a physical or mental impairmentthat substantially limits one or more of the major life activities
of such individual; (B) a record of such an impairment; or (C) being
regarded as having such an impairment." 42 U.S.C. 12102(2)
(emphasis added). Pursuant to the New Hampshire Department of
Safety regulation, an applicant can be required to take a road test
to renew his or her driver's license
 if the director has any reason to believe the
 applicant may be a hazard to public safety if
 licensed to drive, such as but not limited to
 apparent psychological or physical impairment.

N.H. Code Admin. R. [Saf-C] 1003.27(b) (emphasis added). This
regulation clearly distinguishes between those who have an apparent
disability, described as an apparent psychological or physical
impairment, and those who do not. The requirement that Theriault
take a road test because of his apparent disability was
discriminatory within the meaning of the ADA. 
 II. 
 In concluding that the New Hampshire regulation does not
"discriminate" on the basis of disability as that term is used in
the ADA, the majority focuses primarily on "meaningful access" to
government services and programs. Inasmuch as Theriault received
a driver's license renewal, the majority is correct in recognizing
that one of the goals of the ADA has been vindicated. However, this
focus on access does not permit adequate review of the process
through which the government determines qualifications for a
program. That process may be as discriminatory as the ultimate
determination of eligibility itself. Yet the majority seems to say
that it is only once all the qualification judgments have been made,
and the entitlement to access established, that the disabled can
claim that there is discrimination within the meaning of the ADA if
access to the program is denied.
 The majority cites the ADA's prohibition of
discrimination against "qualified" individuals to support its
conclusion that different treatment of a disabled individual during
a "threshold inquiry" into qualifications is not discrimination
within the meaning of the ADA. So long as some reasonable,
objective basis for questioning an applicant's qualifications is
present, there is no discrimination. Thus, in the qualifications
context, the majority reads an "invidiousness" or "irrationality"
element into the statutory definition of "discrimination."
 I think that is too narrow a view of the ADA, one
purpose of which is "to provide a clear and comprehensive national
mandate for the elimination of discrimination against individuals
with disabilities." 42 U.S.C. 12101. Congress did not premise
the ADA on "reasonable" assumptions about people with disabilities. 
The ADA establishes a framework for scrutinizing all government
regulations that discriminate on the basis of disability, not just
unreasonable ones. In enacting the ADA, one of Congress' targets
was society's basic assumption that it is reasonable to link 
"disabled" with "not qualified." Congress recognized the inherent
unfairness embodied in such assumptions:
 The discriminatory nature of policies and
 practices that exclude and segregate disabled
 people has been obscured by the unchallenged
 equation of disability with incapacity and by
 the gloss of "good intentions." The innate
 biological and physical "inferiority" of
 disabled people is considered self-evident. 
 This "self-evident" proposition has served to
 justify the exclusion and segregation of
 disabled people from all aspects of life.

S. Rep. 101-116, at 16 (1989); H.R. Rep. 101-485, at 41 (1990)
(quoting testimony of Arlene Meyerson), reprinted in 1990
U.S.C.C.A.N. 267, 323. Congress was of course concerned with
ensuring that qualified individuals with disabilities be given
opportunities commensurate with their real abilities. But Congress
also took cognizance of the discrimination experienced by the
disabled during the process of gaining access to opportunity and
sought to limit such discrimination. The stigmatic effects of such
discrimination are very real, leading Congress to conclude that
"[d]iscrimination produces fear and reluctance to participate on the
part of people with disabilities." S. Rep. 101-116, at 16 (1989);
H.R. Rep. 101-485, at 42 (1990), reprinted in 1990 U.S.C.C.A.N. 267,
324. That is why additional administrative requirements applied
only to those with an apparent disability are subjected to the more
searching inquiry of necessity rather than mere reasonableness. See28 C.F.R. 35.130(b)(7) (discussed below).
 New Hampshire's regulation classifies people on the basis
of apparent disability rather than on their actual ability to drive
safely. Simply put, New Hampshire discriminates against the entire
class of disabled persons -- qualified and not qualified alike --
to ensure that no driver's license is issued to a disabled person
who cannot drive safely (and, thus, is not qualified). New
Hampshire's regulation discriminates against both qualified and non-
qualified individuals with disabilities by singling out disabled
individuals as a group for separate treatment. It is the use of
disability as a proxy for "presumptively not qualified" that works
the discrimination of which Theriault complains. 
 Assuming non-disabled individuals are qualified while
assuming disabled individuals are not is generally inconsistent with
the ADA. A similar proscription from Title I of the ADA helps to
inform this understanding. The ADA explicitly forbids
discrimination "in regard to job application procedures" and
specifies that the term "discriminate" includes "limiting,
segregating, or classifying a job applicant in a way that adversely
affects the opportunities or status of such applicant or employee
because of the disability of such applicant." 42 U.S.C. 12112. 
In Title I language very similar to the Title II regulation (28
C.F.R. Part 35) under which we review New Hampshire's driver's
license renewal program, the ADA prohibits the utilization of
"standards, criteria, or methods of administration . . . that have
the effect of discrimination on the basis of disability." 42 U.S.C.
 12112(b)(3). Methods of administration which assume that non-
disabled individuals are more likely to be qualified than disabled
individuals "have the effect of discriminating on the basis of
disability," even if they have intuitive appeal as reasonable.
 The majority further concludes that New Hampshire's
program does not discriminate on the basis of disability because the
road test requirement was based on the symptoms of a disability
(Theriault's limited use of his hands) rather than the disability
itself (cerebral palsy). The majority disassociates Theriault's
disability from the symptoms of that disability, stating that
"[t]here is no evidence ... that Theriault was singled out because
he is a disabled individual." Instead, he was asked to take the
road test because of "his physical condition on the day of the
test." I question the validity of this distinction. Theriault was
singled out for a road test because he has a disability which always
manifests itself in the limited use of his hands. He is disabled
because he has these symptoms.
 I think School Board of Nassau County, Fla. v. Arline,
480 U.S. 273 (1987), does not support the majority's distinction
between a response to the symptoms of a disability and the
disability itself. In Arline, the school board sought to shield its
treatment of a teacher with tuberculosis from review under Section
504 of the Rehabilitation Act of 1973. Id. at 276. The school
board argued that its treatment of Arline was not based on her
tuberculosis as such, but on her contagiousness. Id. at 281-82. 
The Supreme Court rejected this reasoning, opining that "[i]t would
be unfair to allow an employer to seize upon the distinction between
the effects of a disease on others and the effects of a disease on
a patient and use that distinction to justify discriminatory
treatment." Id. at 282. A fortiori, if the law does not recognize
a distinction between a disability and its possible effect on others
(i.e., contagiousness), the law does not recognize a distinction
between a disease and its effect on the afflicted individual
himself. As the Supreme Court recognized, 
 Congress extended coverage ... to those
 individuals who are simply "regarded as
 having" a physical or mental impairment. The
 Senate Report provides as an example of a
 person who would be covered under this
 subsection "a person with some kind of visible
 physical impairment which in fact does not
 substantially limit that person's
 functioning." 

Id. (quoting S. Rep. 93-1297, at 64). Theriault is just such an
individual: he has a visible physical impairment which in fact does
not substantially limit him from functioning as a driver. 
Nonetheless, Theriault was treated differently because of his
visible physical impairment, which is exactly what Congress sought
to address through the ADA.
 III.
 Recognizing that discrimination is taking place is
critical because it shifts the burden to the government to justify
the discrimination. Thus, a policy or practice that discriminates
on the basis of disability in the administration of a governmental
program cannot be defended on the basis that the policy is
reasonable. The ADA sets a higher standard for justifying
governmental discrimination on the basis of disability: in the
present context, the government must show that the discrimination
itself is "necessary" to the licensing scheme, or that modification
would work a "fundamental alteration" in the program. See 28 C.F.R.
 35.130(b)(7)&(8); see also Clark v. Virginia Bd. of Bar Examiners,
880 F. Supp. 430, 443-43 (E.D. Va. 1995) (holding that under Title
II of the ADA, when an "additional burden discriminates against
those with disabilities . . . the [public entity] must show that
[the additional burden] is necessary to the performance of its
licensing function").
 This affirmative burden on the government to justify the
discrimination is inconsistent with some of the district court's
reasoning in denying Theriault's claim and demands further
explication. After finding that Theriault had failed to articulate
a prima facie case of unlawful discrimination, the district court
provided an alternative ground for its decision by doing a McDonnell
Douglas analysis. The court held that the Commissioner had
advanced a "legitimate non-discriminatory basis" for requiring the
road test and that Theriault had "failed to produce any evidence
that would reasonably support a finding of discriminatory animus on
defendant's part." Because the majority agrees with the district
court that no discrimination under the ADA had been established, it
declines to comment on the propriety of this alternative holding. 
Because I find that the regulation does discriminate, but
nevertheless withstands ADA scrutiny, a discussion of the
appropriate legal framework is in order. 
 The McDonnell Douglas analysis is inapposite when
examining a regulation for compliance with Title II of the ADA. 
McDonnell Douglas established a process for inferring discriminatory
intent when direct evidence of such intent is lacking. SeeMcDonnell Douglas, 411 U.S. at 802-03. However, in a facial
challenge to a regulation under Title II of the ADA the intent of
the public entity that promulgated the regulation is not at issue. 
Title II prohibits public entities from acting in a way which has
the effect of discriminating on the basis of disability, whether the
public entity intended to discriminate or not. See 28 C.F.R. 
35.130(b)(3) (prohibiting public entities from administering
programs or criteria that "have the effect of subjecting qualified
individuals with disabilities to discrimination on the basis of
disability" pursuant to Title II of the ADA); see also Tyler v. City
of Manhattan, 118 F.3d 1400, 1407 (10th Cir. 1997)("In enacting the
ADA, Congress recognized that discrimination against the disabled
is often the product of indifference rather than animosity."). In
interpreting Section 504 of the Rehabilitation Act, the Supreme
Court stated that "much of the conduct that Congress sought to alter
in passing the Rehabilitation Act would be difficult if not
impossible to reach were the Act construed to proscribe only conduct
fueled by discriminatory intent." Alexander v. Choate, 469 U.S.
287, 296-97 (1985). Therefore, McDonnell Douglas burden shifting
is unnecessary in this context; intent need not be found. Once
Theriault showed that the challenged regulation discriminated among
applicants on the basis of disability, the burden should have
shifted to the Commissioner to justify the regulation as necessary
to protect public safety.
 Not all disability-based discrimination is prohibited by
the ADA. Indeed, where, as in the present context, important
public safety concerns are present, some discrimination may be
permissible. See e.g., 28 C.F.R. Pt. 35, App. A, at 477 (1997)(in
establishing safety standards for licensees "the public entity must
ensure that standards that it promulgates do not discriminate
against ... qualified individuals with disabilities in an
impermissible manner")(emphasis added). The inquiry turns then on
whether the New Hampshire regulation impermissibly discriminates.
 The ADA regulations require public agencies to eliminate
policies, practices, and procedures which discriminate on the basis
of disability "unless the public entity can demonstrate that making
[] modifications would fundamentally alter the nature of the
service, program, or activity." 28 C.F.R. 35.130(b)(7). The
regulations go on to prohibit eligibility criteria that have the
effect of discriminating against disabled individuals "unless such
criteria can be shown to be necessary[.]" 28 C.F.R. 35.130(b)(8); 
see also 28 C.F.R. Pt. 35, App. A, at 478 (1997)(citing driver's
license requirements as a context where policies which tend to
screen out disabled individuals can be justified by safety
concerns). The ability to require a road test is necessary if the
Commissioner is to adequately protect public safety. The ADA does
not require a state to forgo testing and rely solely on a license
renewal applicant's representations of driving ability. Nor does
the ADA demand that a state require every renewal applicant take a
road test in order to legitimize more selective testing. Such a
drastic change would "fundamentally alter" the program as that term
is used in 28 C.F.R. 35.130(b)(7) and is therefore not required
by the ADA. As the majority points out, the state must be given
some leeway in balancing public safety concerns with the ADA's anti-
discrimination mandate. The regulation at issue here appropriately
charts that course. Because the Commissioner has affirmatively met
the burden required to justify discrimination under the ADA, I
concur.